[No. C005317. Third Dist. May 3, 1993.]

PACIFIC GAS AND ELECTRIC COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SUTTER COUNTY, Respondent;
ANACAPA OIL CORPORATION et al., Real Parties in Interest.

## COUNSEL

Howard V. Golub, David H. Fleisig, Richard L. Meiss and Pamela C. Christensen for Petitioner.

Hanna & Morton, Edward S. Renwick, David C. Karp, Diepenbrock, Wulff, Plant & Hannegan and Forrest A. Plant for Real Parties in Interest.

## OPINION

BLEASE, Acting P. J.—This matter arises on a petition for a writ of mandate directing the superior court to overturn its order vacating a binding arbitration award. The award determines the rights and obligations of the parties to contracts for the purchase of natural gas. The superior court vacated the award for legal errors committed by the arbitrators in the construction of the contracts.

When the matter was first before us we granted the petition, determining that the scope of judicial review of an arbitration award ordinarily does not extend to such errors. The Supreme Court granted review and, after issuing *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899], remanded the matter for reconsideration in light of that opinion. Having reconsidered, we will again grant the petition.

The arbitration award resolves disputes concerning the construction of contracts for the purchase of natural gas by Pacific Gas and Electric Company (PG&E) from real parties in interest Anacapa Oil Corporation (Anacapa). The award construed the contracts to permit repricing of the gas at a market price below the ceiling price established by federal law.

The superior court vacated the award on the ground "[t]he arbitrators exceeded their powers" by misconstruing the contracts. (Code Civ. Proc.,

§ 1286.2, subd. (d).)[1] The court construed the contracts in the light of federal law to require that the federal ceiling price be made a *floor* price when the market price declines below the ceiling price. It justified a traverse of the legal merits of the award on two grounds: (1) the issues submitted to arbitration were "qualified," i.e., were to be resolved pursuant to the law in the manner of a court; and (2) legal errors in the construction of the contracts appear "on the face of" the award. Anacapa concedes that under *Moncharsh* review cannot be justified on the latter ground. It contends the former ground remains viable.

*Moncharsh* held that, with limited exceptions provided by statute, an arbitrator's award is not reviewable for errors of fact or law. We will conclude that in the absence of an agreement specifying a broadened scope of review this rule applies regardless whether the issues submitted are qualified. The contracts provide for a *binding* determination of any question of market price and of "any other dispute . . . arising . . . under any provision [of the contracts] . . . submitted by either party to arbitration." This rule of finality precludes judicial vacation of the award for mere error of law or fact. Anacapa also contends that the ordinary rule precluding review should not be applied to the arbitration of an adhesion contract. We reject that view.

Anacapa further contends that the award was properly vacated under a statutory exception to the general rule recognized in *Moncharsh*, where the "arbitrators exceeded their powers" in construing the contracts. Anacapa submits that the arbitrators exceeded their powers because their construction of the gas purchase contracts entailed their reformation. *Moncharsh* did not address this issue. We will conclude that finality does not immunize an arbitration award from review for error so egregious that it produces a result completely outside the expectations of the parties to a contract, i.e., where the arbitration award arbitrarily remakes the contract. We will conclude, however, that in this case the award does not remake the contracts and thus satisfies this limited standard of review.

Last, Anacapa contends that in construing the contract to permit repricing at market prices below the federal ceiling prices the award compels an illegal act or an act violating public policy. Anacapa argues that the question whether some of its gas was deregulated as natural gas produced from new onshore production wells was consigned to a federal agency, and that the arbitration of the issue thereby violates public policy regarding the manner of resolution. We will conclude that the award does not compel Anacapa to perform an illegal act or deprive it of any right in derogation of public policy.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

We will issue a peremptory writ of mandate commanding the superior court to rescind its order vacating the arbitration award.

FACTS AND PROCEDURAL BACKGROUND

A. *The Gas Purchase Agreements*

In 1971 and 1973 the parties entered into two contracts for the purchase by PG&E of gas produced from wells owned by Anacapa. Each contract employs virtually the same terms. Each contract provides for a set price for the gas unless modified in accordance with subparagraph 7(b). Subparagraph 7(b) of each contract provides in identical terms for the redetermination of the price after January 1, 1975, upon request of either party. If the parties fail to agree on a new price "the price to be paid for such gas shall be the reasonable market value of such gas, which . . . shall be established by arbitration in accordance with Section 6 of the attached General Conditions."

Section 6 of each contract provides that "[t]he decision of a majority of the arbitrators, after a hearing . . . shall be binding upon the parties hereto." It also provides that "[i]n addition to those disputes which are required to be arbitrated under the provisions hereof [i.e, market price], any other dispute . . . arising between Buyer and Seller under any provision hereof which cannot be settled by the parties within a reasonable time may be submitted by either party to arbitration" by a panel of three arbitrators. Further, "[e]xcept as otherwise specifically provided in this Section any arbitration shall be subject to the provisions of Title 9 of Part 3 of the Code of Civil Procedure," which provides for a statement of decision in ordinary civil cases.

On November 8, 1978, the Natural Gas Policy Act of 1978 (NGPA) went into effect. (15 U.S.C. § 3301 et seq.) It divided natural gas into various categories and provided for respective "ceiling prices," the maximum lawful price at which the gas could be sold. By letter agreements dated June 30, 1980, the parties amended their 1971 and 1973 contracts to take into consideration the ceiling prices mandated by the NGPA. Each letter agreement provides that "Effective January 1, 1982, the price . . . shall be revised each month to the price equal to the highest applicable price . . . under (i) Section 102 of the NGPA . . . ." Each letter agreement further provides that "[a]t such time as ceiling prices under the Natural Gas Policy Act of 1978 . . . cease to apply to all or any part of [Anacapa's] gas, then the provisions of subparagraph 7(b) shall apply to the redetermination of the price to be paid for gas delivered . . . ." Pursuant to these provisions each subparagraph 7(b) of the 1971 and 1972 contracts was amended to provide that

"[e]ffective upon deregulation of price controls under any Federal or State legislation, and not more than once in any subsequent three-year period," either party could invoke the repricing provisions of section 6 and secure a market price determination by binding arbitration. Finally, each letter agreement provides that "[a]t no time shall the price paid for gas delivered under said agreement exceed the maximum lawful price permitted by legislation enacted by the United States or the State of California."

On January 1, 1985, some gas subject to the NGPA was deregulated. On that date PG&E invoked subparagraph 7(b) and sought an agreement with Anacapa to value the gas produced from all of the Anacapa wells at its market price. Anacapa refused, contending that under a proper construction of the NGPA none of its gas was deregulated and that the ceiling prices continued to apply. That gave rise to the proceedings resulting in this petition.

### B. The Submission to Arbitration

On March 25, 1985, Anacapa filed a complaint in the Superior Court for the County of Sutter seeking a declaration that under sections 102 and 105 of the NGPA, Anacapa is entitled to be paid the ceiling price for gas produced from its wells and seeking damages in the amount of the underpayments found to be due. Anacapa also sought a declaration that PG&E had an implied obligation under the contracts to avoid causing physical harm to Anacapa's wells or harm to Anacapa's interest in obtaining gas from reservoirs tapped by neighboring producers by shutting in or failing to take enough gas from its wells.

PG&E responded with a petition to compel arbitration of the "controversies that are the subject of the lawsuit . . . in the manner provided by paragraph 7(b) of the 1971 Agreement and of the 1973 Agreement and paragraph 6 of the General Conditions." Anacapa objected to arbitration principally upon the ground that submission of any controversy other than pricing to arbitration is subject to the consent of both parties. With respect to the issue of shut in, Anacapa claimed the contracts should be read as adhesion contracts. The court granted the petition and ordered arbitration[2] on the ground that doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration.

Anacapa proceeded to arbitration and proposed an agenda containing a "Statement of Issues" for resolution. These issues, labeled A., B., and C.,

---

[2]Following this order the parties, on July 29, 1987, filed a stipulation in the legal action instituted by Anacapa that, in the event there is a final determination that the price PG&E pays for Anacapa's gas is subject to price redetermination as of January 1, 1985, under the 1971 and 1973 agreements, as modified by the June 30, 1980 amendments, that the fair market price for gas delivered in specified years would be as stipulated.

were incorporated in the arbitrators' prehearing order as the "basic issues" of the proceeding. They are:

"A. Whether, as contended by Anacapa, the June 30, 1980 Amendments to the 1971 and 1973 Agreements obligate PGandE to pay Anacapa ceiling price for gas purchased *after* December 31, 1984. 'Ceiling price,' of course, means ceiling price under the Natural Gas Policy Act of 1978. If so, how much money does PGandE owe Anacapa? [¶] B. Whether, as contended by PGandE, during any period of time prior to January 1, 1985, gas from any of Anacapa's wells was misclassified for Natural Gas Policy Act purposes so that PGandE paid an amount in excess of the maximum lawful ceiling price? If so, to what extent is PGandE entitled to a refund for any such excess payment? [¶] C. To what extent does PGandE have an obligation, as contended by Anacapa, to avoid causing drainage of gas away from Anacapa's wells and into wells operated by Anacapa's competitors? [¶] D. Assuming for sake of argument that PGandE is not obligated to pay ceiling price for the gas purchased from Anacapa after December 31, 1984, then the contracts call for a reversion to "reasonable market value." If reasonable market value rather than ceiling price is the standard after December 31, 1984, what is the reasonable market value of the gas sold by Anacapa to PGandE?"

In addition the parties agreed to a provision in the prehearing order that "The award will be in the form of a statement of decision, as provided by C.C.P. § 632, issued by the arbitrators."

### C. *The Arbitrators' Award*

A bifurcated hearing was held on issues A., B., and C. and a written award issued by a majority vote of two of the three arbitrators. In general, the majority arbitrators upheld PG&E's position on all three issues. As to issue A., they concluded that the 1980 amendments to the contracts did not obligate PG&E to continue to pay ceiling prices. They reasoned that under subparagraph 7(b) of the contracts either party may request a redetermination of price effective upon deregulation of price controls of "any" of the gas subject to the agreements and deregulation occurred on January 1, 1985, pursuant to the criteria of 15 United States Code section 3313 (repealed eff. Jan. 1, 1993). The arbitrators concluded that the "evidence established that four wells owned by the Anacapa 1971 program [met the section 3313 criteria]. Thus, ceiling prices ceased to apply to part of [Anacapa's] gas . . . effective January 1, 1985 . . . ."

As to issue B., the arbitrators concluded that PG&E had overpaid for certain gas obtained from Anacapa prior to January 1, 1985. Lastly, with

respect to issue C., they held that PG&E owed no obligation to avoid damage to Anacapa's wells. The dissenting arbitrator disagreed on all three issues.

### D. *Vacation of the Award by the Superior Court*

On motion by Anacapa, the superior court vacated the award for errors of law. As related, it reasoned that it had the authority to review the construction given the gas purchase contracts by the arbitrators on the grounds the agreement submitting the issues to arbitration was "qualified" and that legal errors in the construction of the contracts were apparent on the face of the written award.

The superior court agreed with the arbitrators that the 1980 amendments obligated PG&E to pay NGPA "ceiling prices" until they "ceased to apply" under the NGPA by operation of its provisions for the deregulation of gas prices. However, it concluded that gas from the disputed wells had not been deregulated by the NGPA. For that reason it concluded PG&E could not invoke the repricing provisions of the amendments to subparagraph 7(b).

With respect to issue B. the court found that the arbitrators exceeded their legal powers by misclassifying four wells. The classification, it reasoned, turns on whether the lands on which the wells were drilled were committed to PG&E prior to the effective date of the NGPA. Whether that is the case is dependent upon a factual claim which was resolved by the court as a matter of law on grounds the arbitrators had incorrectly employed the parol evidence rule to bar Anacapa's evidence that the location of the lands by a line on a map in evidence was superseded by subsequent oral modifications.

Lastly, with respect to issue C. the court found as a matter of public policy that landowners are entitled to protection against "fraudulent" drainage.

PG&E promptly sought a writ of mandate from this court, contending that none of the bases for judicial review of arbitration awards warranted the superior court's action in vacating the award.

## Discussion

## I

### *Scope of Review*

#### A.

### *The General Rule Limiting Judicial Review of Arbitration Awards Applies to Awards Following a Qualified Submission*

█ In *Moncharsh* the Supreme Court held that, with "limited exceptions," "an arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." (3 Cal.4th at p. 6.) This rule vindicates the parties' contractual choice of an arbitral forum over a judicial one. (*Id.* at pp. 8-11.) The opinion notes that some arbitration awards are inherently unsuitable for judicial review of legal error since arbitrators are not bound to decide based upon " 'principles of dry law' " unless that has been specifically required by the parties to the arbitration. (*Id.* at pp. 10-11.)

Anacapa argues that this case lies within exceptions to the general rule.[3] Its most far-reaching claim is that an arbitration award predicated upon a qualified submission, by which the arbitrator is directed to apply the law as would a court, is reviewable for errors of law. Anacapa impliedly locates this exception in section 1286.2, subdivision (d), which directs the vacation of an award when "the arbitrators exceeded their powers . . . ." The argument simply put is that if the arbitrators are directed to apply the law and fail to do so they exceed their powers. The claim is not persuasive. It confuses the mode of decision with its finality.

*Moncharsh* reasons that finality attaches to an arbitration award "because it vindicates the intentions of the parties that the award be final, and because an arbitrator is not ordinarily constrained to decide according to the rule of

---

[3]Anacapa also argues that since the contracts affect interstate commerce the scope of review is determined by the Federal Arbitration Act. This claim can be summarily dispatched. Although the contracts affect interstate commerce and the construction of federal statutes is an aspect of the task of interpreting the contracts, the federal law of arbitration does not govern. The contracts provide that "any arbitration shall be subject to the arbitration provisions of the Code of Civil Procedure of the State of California." For this reason, under the federal choice of law rule applicable to arbitration, state law governs. (See *Volt Information Sciences, Inc.* v. *Board of Trustees of the Leland Stanford Junior University* (1989) 489 U.S. 468 [103 L.Ed.2d 488, 109 S.Ct. 1248].)

law . . . ." (3 Cal.4th at p. 11.) Anacapa suggests that absent both of these pillars, in cases where the arbitrator is constrained to decide according to the law, unrestricted review for errors of law is available. Assuming for the sake of argument that, as Anacapa argues, this is a case of qualified submission, there is no persuasive reason to accord a broader scope of review by reason of that consideration.

Regardless whether the submission agreement directs that the award be founded upon "dry law" or more broadly upon "equitable considerations," the arbitrators do not exceed their powers merely by mistaking the law. "It is well settled that 'arbitrators do not exceed their powers merely because they assign an erroneous reason for their decision.' (Citations.) A contrary holding would permit the exception to swallow the rule of limited judicial review . . . ." (*Moncharsh, supra,* 3 Cal.4th at p. 28.)

The arbitration agreements do not address the scope of judicial review of the task submitted to the arbitrators. They provide for a binding determination of any question of market price and of "any other dispute . . . arising . . . under any provision [of the contracts] . . . submitted by either party to arbitration." This provision embodies the expectation that the arbitration award will be accorded a finality not given the judgment of a trial court and for that reason it must be accorded a different scope of judicial review. It is for this reason that the courts may not review a binding award for mere error of law or fact.

The submission of a dispute to arbitration as an alternative to judicial adjudication is a matter of contract. (See, e.g., *Moncharsh, supra,* 3 Cal.4th at pp. 8-9.) If parties contract to submit an issue of law to binding arbitration they may not as a matter of course reopen a "final" resolution of the issue on the ground the arbitrators "exceeded their powers." A principal reason for selecting arbitration is that the cost of the judicial forum is not worth the additional assurance it may afford of the correct result. That purpose, which the law favors, is disserved if review of questions of law decided in arbitration is freely available. The parties to a contract may draft an arbitration provision so as to afford judicial review of questions of law. The question here is what, if any, judicial review should be afforded where they have not done so. This is a question of the contract term to be supplied by law. (See Rest.2d Contracts, § 5, com. (b).)[4] In this case the parties expressed the intent that the arbitration award is "binding." Regardless of such

---

[4]The Restatement comment, in pertinent part, is as follows: "Much contract law consists of rules which may be varied by agreement of the parties. Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of an

a provision, it is commonly expected, in the absence of a contrary provision, that the arbitrators' decision will be final. (See, e.g., *Moncharsh*, 3 Cal.4th at p. 9.)

The policy of the law favoring arbitration is founded, in part, on the savings it will afford the public in costs of avoidable litigation. That purpose is advanced by requiring that the parties carry the burden of specifying that an unusual scope of judicial review is to be accorded an arbitration decision on a question of law. The purpose would be wholly frustrated if the legal merits of the arbitrators' decision could be visited anew in the superior court followed by yet another appeal. That would add a layer of litigation not available in the judicial forum.

The consideration that the submission agreement is qualified affords no persuasive reason to broaden the scope of judicial review. The fact that the parties restrict the arbitrator to a decision of the issues in the manner of a court of law does not mean that they expect that the decision is reviewable. The mode of decision and its reviewability are separate questions. (See, e.g., *Utah Construction Co.* v. *Western Pacific Ry. Co.* (1916) 174 Cal. 156, 163 [162 P. 631] [noting that under a qualified submission the question remains whether the arbitrator was empowered "to decide the law wrongly as well as rightly.".])

Even where, as here, the parties specify that the arbitrators should state the reasons for the award in the manner of a statement of decision, no compelling inference may be drawn that the purpose of the statement is to afford a basis for broad-ranging judicial review. "There may be any number of reasons for this: the payment by the parties of a fee may require something for their money besides a decision; they may genuinely wish guidance for the future; they may feel that though one side may lose the immediate case the arbitrator may, in his opinion, indicate the error of the other side's ways." (Feldman, *Arbitration Law in California: Private Tribunals for Private Government* (1957) 30 So.Cal.L.Rev. 375, 464.) We add that the parties may wish the benefit of the improved decisionmaking that comes from the discipline of a written justification or, as here, the opportunity to respond to the written exposition of a complex matter.

For all of these reasons, regardless whether the submission is qualified, a mistake of law is ordinarily not subject to judicial review. Similarly, errors of fact are not reviewable. Under a submission that does not expressly provide for judicial review it may not be claimed that the evidence was

---

agreement. They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties." (*Ibid.*)

insufficient to support the factual findings of the arbitrators. (See, e.g., *Morris* v. *Zuckerman* (1968) 69 Cal.2d 686, 691 [72 Cal.Rptr. 880, 446 P.2d 1000].) If the parties desire a different scope of judicial review, that must be specified in the contract. (Cf. § 1296.)

B.

*An Exception to the Rule of Finality Applies Where the Arbitrator's Powers Have Been Exceeded by an Arbitrary Remaking of the Contract Under Which the Arbitration Occurs*

■ Anacapa notes that under section 1286.2 it is entitled to a limited judicial review to determine if "[t]he arbitrators exceeded their powers . . . ." It argues that where arbitrators are directed to apply the language of a contract they may construe ambiguous language but exceed their powers in "rewriting, reforming or modifying unambiguous language in a contract." PG&E replies that since no provision of the arbitration agreements explicitly restricts the arbitrators' power to modify or amend the contract they are not so limited. We disagree with both positions.

Where, as here, arbitrators are empowered to resolve disputes arising under the provisions of a contract the contract delimits their power. Implicit in this grant of power is the principle that the resolution of the dispute is within the foreseeable range of dispositions in the ordinary forum, the courts. A dispute arising under the provisions of a contract is not meant to be resolved without reference to those contractual provisions.

As the history of the arbitration case law detailed in *Moncharsh* shows, the law has not found a position of repose on the question of judicial review. That, in part, is attributable to misgivings about the propriety of assigning a *completely* unreviewable power to private persons to authorize an award that is judicially enforceable. The fundamental purpose of a *written* contract is to subject, insofar as feasible, the jural consequences of future events to a written standard. If the arbitrators are completely cut loose from these contractual moorings, they may impose, through judicial enforcement of the award, any remedy, however fantastic, excepting only those that are illegal per se. The policy which favors the finality of an arbitration award should not be nor need not be extended to this extreme.

We are not persuaded to the contrary by the failure of the *Moncharsh* court to explicitly recognize such a review. It adhered to "cases that limit judicial review of private arbitration awards to those cases in which there exists a statutory ground to vacate or correct the award," such as the provision of

section 1286.2, subdivision (d) which directs vacation of an award where the arbitrators exceed their powers. (*Moncharsh, supra*, 3 Cal.4th at p. 28.) The court did say that "[i]t is well settled that 'arbitrators do not exceed their powers *merely* because they assign an erroneous reason for their decision.'" (*Ibid.*, citations omitted; italics added.) *Moncharsh* cites in support of that proposition *Hacienda Hotel* v. *Culinary Workers Union* (1985) 175 Cal.App.3d 1127, 1133 [223 Cal.Rptr. 305], which distinguishes between a mere error of law and an error involving "a completely irrational construction to the provision in dispute. . . ." (Internal quotations & citations omitted.) *Moncharsh* expressly decides no more than that "[t]o the extent Moncharsh argues his case comes within section 1286.2, subdivision (d) *merely* because the arbitrator reached an erroneous decision, we reject the point." (*Moncharsh, supra*, 3 Cal.4th at p. 28, italics added.) This case poses the question whether arbitrators exceed their powers by engaging in error which transcends a mere erroneous decision.

The principal justification for restricting judicial review of an arbitration award is the consent of the parties. Regardless how egregious the error of law, if the complaining party could anticipate the error when consenting to arbitration there is no basis for complaint. If, for example, the disputed issue of law has actually arisen, the positions of the disputants are staked out, consent is *then* given to arbitrate the dispute and the arbitrator accepts the legal position of one side, the loser has no fair complaint regarding the outcome. Similarly, a party to a contractual arbitration may not complain that the arbitrators employed a reasonable interpretation of the contract language in the resolution of a dispute.

However, where the consent to arbitrate precedes the dispute and the error of law involves an application of the contract that is so bizarre as to be unforeseeable there is a basis for complaint by the disadvantaged party and a warrant for judicial protection. The fairness of binding a party based upon consent attenuates as the consent becomes less informed. This was the basis of the early common law antipathy toward contracts for the arbitration of future disputes. Corbin explains the reasons. "It seems, therefore, that the supposed vice of general and unlimited arbitration agreements lay in the fact that parties try to bind themselves to avoid the courts and to submit to private arbitration issues that at the time they do not have clearly in mind, which after they have arisen one of them is no longer willing to submit to the private arbitrators. The friendly arbitration of a dispute is nearly always desirable. It seems otherwise where the proceeding is against the will of one of the parties, who has lost confidence in the arbitrators or in the method." (6A Corbin on Contracts (1962) § 1433, p. 393; also see e.g., *Blodgett Co.* v. *Bebe Co.* (1923) 190 Cal. 665, 667, [214 P. 38, 26 A.L.R. 1070] [the

underlying policy of the original statutes was that open-ended agreements to arbitrate future disputes ought *not* be encouraged as that would deprive citizens of "the protection of the courts"]; see generally, Civ. Code, § 1542 ["A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release . . . ."].)

These considerations provide a principled justification for a limited judicial review of the claims tendered by Anacapa. Anacapa claims the award rests upon an egregious construction and application of written contracts. There is authority for a limited review of such questions. In *Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313], a case among those relied upon by *Moncharsh* as holding that the exclusive means for vacating an award are provided by statute (3 Cal.4th at p. 24), a union sought to arbitrate a question concerning vacation pay under its collective bargaining contract. The superior court denied the petition to arbitrate on the ground that the contract was unambiguous in precluding the claimed vacation pay. (*Posner, supra,* 56 Cal.2d at p. 174.) The Supreme Court reversed the judgment adopting the *federal* rule—"all disputes as to the meaning, interpretation and application of any clause of the collective bargaining agreement, even those that prima facie appear to be without merit, are the subject of arbitration . . . ." (*Id.* at p. 184, fn. omitted.) However, the court said this did not betoken "a complete judicial retreat from the field of arbitration in collective bargaining cases, which could result in the *arbitrary remaking* of the collective bargaining agreement by an arbitrator contrary to the intentions of the parties." (*Ibid.,* italics added.) The court asserted that evidence of practices could be adduced to aid in resolving ambiguities in the written agreement, but not to add new or contradictory terms. (*Id.* at pp. 184-185.)

We draw from this concern that where the award rests on a construction of a written contract under a provision for arbitration of *future* disputes, a party should be afforded a limited judicial review of a claim that the arbitrators arbitrarily remade the contract. This view finds support in the recurrent intimations in the case law that "completely irrational" legal conclusions afford a basis for vacating an award. (See, e.g., *Lesser Towers Inc. v. Roscoe-Ajax Constr. Co.* (1969) 271 Cal.App.2d 675 [77 Cal.Rptr. 100]; *Manatt, Phelps, Rothenberg & Tunney v. Lawrence* (1984) 151 Cal.App.3d 1165, 1171 [199 Cal.Rptr. 246]; *Hacienda Hotel v. Culinary Workers Union, supra,* 175 Cal.App.3d at p. 1133; *Summit Industrial Equipment, Inc. v. Koll/Wells Bay Area* (1986) 186 Cal.App.3d 309, 320 [230 Cal.Rptr. 565].)

Where such a claim is tendered the appropriate standard of review is whether the application or construction of the contract presents such an

egregious mistake that it amounts to an arbitrary remaking of the contract between the parties. Anacapa suggests that the standard should be more narrowly described as whether the arbitrators unreasonably construed the language of the written contract. But this statement is so narrow as to be misleading. As PG&E notes, Anacapa's assertion that this standard would bar arbitrators from "rewrit[ing] *unambiguous* language" (original italics), harkens back to the wooden and outmoded "face of the instrument" doctrine no longer employed, even in the judicial forum, in California. (See e.g., *FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 386-390 [282 Cal.Rptr. 508].) It blinks the reality that in applying a written contract to a dispute it is often the case that the jurist or arbitrator is fashioning a rule of decision in light of the failure of the contract language to specify such a rule. (See, e.g., Rest.2d Contracts, *supra*, § 5, fn. 4; 3 Corbin on Contracts, *supra*, § 541 at p. 97 ["In order to prevent the disappointment of expectations that the transaction aroused in one party, as the other had reason to know, the courts find and enforce promises that were not put into words, by interpretation when they can and by implication and construction when they must."].)

We also reject Anacapa's allied categorical claim that there can be no reformation of a contract by the arbitrators without exceeding their powers. Anacapa predicates a bright line distinction between the permissible construction of a written contract and its reformation. As Corbin notes, there are two clearly distinguishable kinds of cases within the usage of "reformation." (3 Corbin on Contracts, *supra*, § 540, at pp. 88-94.) In the classic reformation case a contract is formed, but a provision of the writing that is executed, through mistake such as a scrivener's error, contradicts the terms to which the parties agreed. In such a case, upon evidence of the actual agreement a court is empowered to correct the error by striking the mistaken language in the instrument and inserting appropriate language. (Civ. Code, § 3399.) There is no reason to hold that an arbitrator is not given the same power by a contract, as here, calling for arbitration of disputes arising under the provisions of a written contract without language expressly prohibiting such reformation.

The other variety of reformation case occurs, in the absence of mistake, when the parties employ language sufficient between themselves, but "so ill-chosen as to mislead third persons and to enable one of the parties to take an unjust advantage of the other." (3 Corbin on Contracts, *supra*, § 540 at p. 92.) As Corbin explains, this is really a case of interpretation or construction of the language used by the parties to show a special meaning they assigned to it. (*Ibid.*; also see Civ. Code, § 1644.) Such reformation is also within the power of arbitrators under the language of the written contract in this case.

Although the narrow exception we recognize will permit some disgruntled arbitrants to seek judicial review, the standard is so strict that it should discourage all but the most serious claims of abuse. We hasten to note the obvious, that success in vacating an arbitration award under this standard requires more than a mere conviction that another construction of the contract is plainly correct. As *Moncharsh* repeatedly says, arbitrators do not exceed their powers merely by reaching an erroneous decision. Nor does the standard we recognize permit a court to usurp the power of the arbitrator by declaring the award's determination an abuse of discretion in the sense under which an appellate court may in some contexts intervene to overturn a mistaken position of a trial court as to which reasonable judges could differ. (Compare *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) The test is one of arbitrariness, not correctness.

This is *not* the sort of review accorded a construction of a contract by the trial court in a legal proceeding. In such a proceeding the reviewing court (the appellate court), in the absence of conflicting extrinsic evidence, resolves questions of ambiguity. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] ["It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence."].) With respect to an arbitration the power to construe matters within the range of ambiguity of the language and evidence of the surrounding circumstances is assigned, with finality, to the arbitrator.

As we will show, none of Anacapa's claims passes this exacting standard of review, and the trial court exceeded *its* powers in vacating the award. Where, as here, the arbitrator's reading and application of the contract is clearly within the range of ambiguity, i.e., within the ordinary bounds of semantic permissibility, there can be no tenable claim that the contract has been arbitrarily remade.

## C.

### There Is No Exception for Contracts of Adhesion

Anacapa submits that whatever the scope of review under other circumstances, it should be broadened at the behest of the weaker party if the contract is one of adhesion. It claims that the contracts with PG&E are adhesive, that it raised the adhesion issue in opposing arbitration and in seeking to vacate the award, and that it is entitled to a broader scope of review, predicated upon the claim. As appears, Anacapa failed to perfect a claim of adhesion and, if it had, no alteration of the standard of review would be appropriate.

## 1.

There is a preliminary issue to resolve. Anacapa claims the issue of adhesion "was called to the attention of both the trial court and the arbitrators." However, that occurred only in connection with its claim the matters at issue are not arbitrable. Although the question of arbitrability vel non does not naturally arise in this writ proceeding, we will reach and resolve the question at the request of the parties.

Anacapa's principal argument turns on the language of the arbitration provisions of the contracts. As related, subparagraph 7(b) of each contract says that if the parties fail to agree on a new price for Anacapa's gas the price shall be measured by reasonable market value "established by arbitration in accordance with Section 6 . . . ." Section 6, in turn, commences: "In addition to those disputes which are required to be arbitrated under the provisions hereof, any other dispute other than price arising . . . under any provision hereof . . . may be submitted by *either* party to arbitration . . . ." (Italics added.) Anacapa argues that under this language market value disputes are required to be arbitrated and other disputes are "permissive" and may be arbitrated only if both parties consent.

The applicable precedent is *Service Employees Internat. Union, Local 18 v. American Building Maintenance Co.* (1972) 29 Cal.App.3d 356 [105 Cal.Rptr. 564]. In that case the agreement provided: " 'In the event that any matter submitted to the Board of Adjustment cannot be settled within five (5) consecutive business days, time may be extended by mutual agreement with the parties hereto, or *the issue in dispute may be submitted to an impartial arbitrator* . . . .' " (*Id.* at p. 358, original italics.) The court viewed the question as "whether, in the agreement's context, [the language in italics] must be construed as implying (1) with the consent of both parties, or, (2) at the option of either." (*Ibid.*)

The court decided that "at the option of either" was the implicit meaning, reasoning as follows. "May" is sometimes used to grant either of the opposing parties a right with regard to the dispute. (*Service Employees, supra,* 29 Cal.App.3d at p. 359.) If that connotation were not employed the arbitration provision would serve little or no purpose, a disfavored result under the canon that contracts should be construed so as to make them operative. (*Id.* at pp. 358-359.) This reasoning is persuasive, all the more so since the clause in this case is explicit in specifying that any dispute "may be submitted *by either party* to arbitration . . . ." If *either* party "may" do so, the consent of both is manifestly not required. In this context the "may" signifies the right of the party to invoke arbitration.

Anacapa relies on *Titan Group, Inc.* v. *Sonoma Valley County Sanitation District* (1985) 164 Cal.App.3d 1122 [211 Cal.Rptr. 62] about which we need say no more than that it concerned the specific wording of the arbitration clause.

Anacapa suggests that we should construe any ambiguity in the arbitration clause against PG&E on the ground that it drafted the contract, employing the canon of construction which calls for construing an ambiguity against the party which caused the uncertainty to exist. We reject the suggestion on two grounds. The first is that this canon applies only as a tie breaker, when other canons fail to dispel uncertainty. (See Civ. Code, § 1654; *Decter* v. *Stevenson Properties, Inc.* (1952) 39 Cal.2d 407, 418 [247 P.2d 11]; cf. 3 Corbin on Contracts, *supra*, § 559, pp. 262-271.) The second reason is that compulsory arbitration is not a term of the contract which inherently favors the interests of PG&E. If Anacapa had prevailed in the arbitration we would likely uphold that result as well. Where the term of a contract might cut either way it is inappropriate to assign a meaning on the happenstance of the outcome of a particular controversy. (See *Jenkins* v. *Tuneup Masters* (1987) 190 Cal.App.3d 1, 7 [235 Cal.Rptr. 214].)

2.

That leaves Anacapa's fallback argument, that adhesion ought to bear on the scope of review of an arbitration award. A careful review of the record shows that Anacapa failed to perfect a claim of adhesion.

Only on the issue of PG&E's duty to avoid drainage was the topic of adhesion broached as a ground upon which to construe the contracts as not providing for arbitration. This claim was based upon the following declarations of fact. PG&E was the only purchaser of gas in the area when the original contract was made. Anacapa was exposed to some (unexplained) degree of risk of loss of its leases if it failed to sell to PG&E. There was no discussion of the arbitration clause. PG&E informed Anacapa that it had a standard form agreement. PG&E prepared and sent such an agreement to Anacapa for signature. Notwithstanding these assertions the superior court granted PG&E's motion to compel arbitration.

The word adhesion was not mentioned in the course of the arbitration proceedings in the brief to which Anacapa points. Nor did it seek a finding on the question of adhesion. After the arbitration Anacapa renewed the claim of nonarbitrability in its massive petition to overturn the arbitration award. It did so, without independent development of the claim of adhesion, by incorporating by reference the earlier memorandum of points and authorities

in opposition to PG&E's motion to compel arbitration. The trial court rejected Anacapa's claim of nonarbitrability. The statement of decision prepared by Anacapa does not mention the question of adhesion as affecting the arbitrability of the drainage issue. Nor does Anacapa make mention of the adhesion claim in its arguments on the issue of arbitrability in this court.

The sketchy factual showing upon which Anacapa (derivatively) relied in the trial court does not *compel* the conclusion that the contracts were adhesion contracts. The implication that provisions of the contract were nonnegotiable, i.e., that PG&E's bargaining stance was take it or leave it, is not squarely made out. (Compare *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 818, [171 Cal.Rptr. 604, 623 P.2d 165] [the performer's association constitution and by-laws required the use of a form contract.].) Anacapa's jeopardy if it failed to sell to PG&E is coyly described in conclusionary and unquantified terms. Finally, the contracts were in fact renegotiated after the original agreements and there is no showing of the economic setting at that time.

In view of these considerations, and the shadowy incorporation by reference of the buried claim concerning adhesion and the failure to press the point, we find no fault in the implied determination by the trial court that the claim of nonarbitrability of the drainage issue by reason of adhesion contract should be resolved against Anacapa.

### 3.

Even if we were to assume that Anacapa had preserved a claim of adhesion we are not persuaded that this should affect the scope of review of an arbitration award. ▮▮ As Anacapa notes, "Where an arbitration clause is part of a contract of adhesion, courts will carefully scrutinize the agreement to assure that the arbitration provisions fall within the reasonable expectations of the weaker, or 'adhering' party, and are not unduly oppressive or 'unconscionable.'" (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 322, fn. 7 [197 Cal.Rptr. 581, 673 P.2d 251].) Anacapa suggests that this solicitude warrants granting a broader scope of review to the adhering party who is dissatisfied with the results of the arbitration. We find the suggestion unpersuasive.

▮▮ Generally speaking, a contract of adhesion is fully enforceable according to its terms unless those terms are outside the reasonable expectations of the adhering party or considered in context are unduly oppressive or unconscionable. (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d at pp. 819-820.) ▮▮ There is a developed doctrine in the case law concerning the

enforceability of a provision requiring arbitration when one party seeks to avoid arbitration on the ground of adhesion. (See, e.g., *id.* at pp. 819-820; *Keating* v. *Superior Court* (1982) 31 Cal.3d 584, 593-595 [183 Cal.Rptr. 360, 645 P.2d 1192].) Imposing arbitration on the unwilling adhering party entails relinquishment of significant rights, e.g., loss of the right to a jury trial and the procedural devices available in the judicial forum. Nonetheless, an arbitration provision in an adhesion contract in a commercial context is generally given effect, absent a showing that it is structured or utilized in such a way as to gain unfair advantage to the party with the superior bargaining power. (*Ibid.*)

There is no suggestion that the arbitration provision here is inherently tilted in favor of PG&E or has been utilized in an unfair manner. If Anacapa succeeded in invalidating the arbitration provision on grounds of adhesion, the question of scope of review would be rendered moot. If unsuccessful, the consequences that attend arbitration, including the limited scope of review provided by law, should obtain. If this were not the case, review of arbitration awards would be unfairly asymmetrical; as a practical matter the adhering party would not be bound by an unfavorable award but the other party would. The benefits to society of the finality of arbitration awards would be significantly undercut by a "heads I win, tails you lose" rule.

## II

*The Arbitrators' Construction of the Contract Concerning Alteration of Price Upon Deregulation of Natural Gas Prices Does Not Arbitrarily Remake the Contract*

Anacapa's paramount claim of legal error is that the arbitrators misconstrued the pricing provisions of the contract. The interpretation and application of those provisions turn upon the construction of the NGPA. Under the contract a redetermination of the price is permitted "[e]ffective upon deregulation of price controls under any Federal or State legislation . . . ." Anacapa contends that the arbitrators erred in finding that there was a deregulation of price controls under the NGPA. We will conclude that the arbitrators' application of the deregulation provisions of the contracts did not exceed the range of semantic permissibility, viewed at the time of formation of the contract; hence there is no arbitrary remaking of the contract.

It follows that arbitrators did not exceed their authority and that their award is final and unassailable.

### A.

The contract permits a redetermination of price only when there is "deregulation of price controls under [the NGPA]." Subparagraph 7(b) of the

1971 contract, as amended by the 1973 agreement, provides for repricing of Anacapa's gas at the request of either party "at any time but not sooner than three years after the effective date of the most recently redetermined price hereunder . . . ." This language was removed by amendment in 1980 and the repricing of the gas tied to the NGPA. Under the 1980 amendment the substituted repricing provision reads: "Effective upon deregulation of price controls under any Federal or State legislation, and not more than once in any subsequent three-year period, either of the parties hereto may [invoke procedures to redetermine the price]."

The letter setting out the 1980 amendment of the contract says that the parties agree that: "At such time as ceiling prices under the Natural Gas Policy Act of 1978 . . .[5] cease to apply to all or any part of Seller's gas, then the provisions of subparagraph 7(b) shall apply to the redetermination of the price to be paid for gas delivered under [the contract]." Anacapa equates the phrase "deregulation of price controls under [the NGPA]" in the amended text of the agreement with "ceiling prices under [the NGPA] cease to apply," the phrase in the letter setting out the agreement to amend. Anacapa argues that such ceiling prices never ceased to apply to its gas— hence, the precondition for redetermination of price, deregulation of price controls, was never met.[6] To understand the argument requires a discussion of the NGPA.

---

[5]Anacapa suggests we fail to take account of the language contained in this ellipsis in the above quotation of the contract, to wit: "any successor legislation to such Act and any legislation enacted by the State of California." It suggests that since the contracts contemplated the continuance of ceiling prices as a result of future legislative action, it is implied that all future legal developments, such as Federal Energy Regulatory Commission's administrative interpretation of 15 United States Code section 3331 (repealed eff. Jan. 1, 1993), must be incorporated into the contract as the measure of cessation of application of the ceiling prices.

We disagree. The reason for the ellipsis is that there never was successor legislation. The wide ranging implication Anacapa wishes incorporated into this text is far short of the clear textual specification that might bar a contrary resolution by the arbitrators. As we later explain, Anacapa's most persuasive argument is based upon the present case law rule concerning judicial deference to federal administrative constructions of the NGPA. However, the present federal rule granting primacy to the interpretations of the federal agency rests upon *Chevron U.S.A.* v. *Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 843 [81 L.Ed.2d 694, 703, 104 S.Ct. 2778], decided in 1984, well after the formation of the contracts at issue.

[6]Many contracts for sale of natural gas entered into after the advent of the NGPA contain pricing provisions anticipating the deregulation of natural gas prices and providing for repricing in that event. (*Martin Exploration Management Co.* v. *F.E.R.C.* (10th Cir. 1987) 813 F.2d 1059, 1068, fn. 11, rev. on other grounds *F.E.R.C.* v. *Martin Exploration Management Co.* (1988) 486 U.S. 204 [100 L.Ed.2d 238, 108 S.Ct. 1765].) The result of a provision pegging the contract price to the NGPA ceiling price when the market falls below that price is that the ceiling becomes a floor. The buyer is now paying more than the market price. This is apparently a widespread phenomenon. "Because by 1984 the market price of natural gas had plunged below the regulated price ceilings, these producers stood to reap higher

## B.

The NGPA imposes a system of price controls on sale of natural gas by producers. The NGPA includes all natural gas in one or more defined categories, each commonly referred to by the section number of the act in which it is defined (as here, §§ 102, 103, 105 and 109). The NGPA provides for maximum lawful prices for each category. However, it also provides, as it did when the parties agreed to the 1980 amendments of the contracts, for elimination of price controls as to certain sales of natural gas effective January 1, 1985. (15 U.S.C. § 3331.) The parties dispute which NGPA categories apply to Anacapa's gas.

The residual NGPA category is section 109 gas. It applies to "any natural gas which is not covered by any maximum lawful price under any other section . . . ." (15 U.S.C. § 3319.) The other categories have higher or lower maximum prices designed to stimulate production of new gas and to reflect the antecedent price controls for gas produced for interstate commerce. There are two such categories of interest here. The first is section 103 gas. Section 103 gas is "natural gas determined in accordance with section 3413 of this title to be produced from any new, onshore production well . . . ." (15 U.S.C. § 3313.) The second category is section 105 gas, natural gas "sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978." (15 U.S.C. § 3315.)

The NGPA provides for the decontrol of prices. Under the act "[the price control provisions for the sale] of each of the following categories of natural gas shall, except as provided in subsections (d) and (e) of this section, cease to apply effective January 1, 1985." (15 U.S.C. § 3331(a).) The "following categories" include: "(2) New, onshore production wells.—Natural gas produced from any new, onshore production well (as defined in § 3313(c) of this title), if such natural gas—[meets two conditions that are undisputed here]" and "(3) Intrastate contracts in excess of $1.00.—Natural gas sold under an existing contract, any successor to an existing contract, or any rollover contract, if [such gas meets two conditions that are undisputed here]." (15 U.S.C. § 3331(a)(2) and (a)(3).) The only applicable exception concerns subdivision (a)(3). (15 U.S.C. § 3331(e).) It provides that where the existing contract calls for a negotiated price the operation of the repricing

contractual prices if their gas was regulated than if it were deregulated." (*F.E.R.C.* v. *Martin Exploration Management Co., supra,* 486 U.S. at p. 208 [100 L.Ed.2d at p. 244].)

One might ask why a buyer would agree to such a provision. Apparently, when the NGPA became law the conventional wisdom was that market prices were bound to steadily increase. (*Martin Exploration Management Co.* v. *F.E.R.C., supra,* 813 F.2d at p. 1071.)

clause is subject to *new* price limits, different from the former limits, as of January 1, 1985.

### C.

Anacapa claims that all of its gas is section 105 gas and that price controls were not eliminated for any of its gas under the decontrol of prices that occurred effective January 1, 1985. As related, there are two contracts in issue. Under the first contract, the arbitrators held that gas from four of Anacapa's wells meets the criteria for decontrol of prices as natural gas produced from new onshore production wells under 15 United States Code section 3331(a)(2). The arbitrators further held that this satisfied the contract criterion of "deregulation of price controls under any Federal . . . legislation" because "ceiling prices ceased to apply to part of the gas produced by . . . Anacapa." Anacapa argues that this is plainly a misreading of the NGPA because it is premised on the conclusion that Anacapa's gas from the four wells is section 103 gas, and that cannot be so because a criterion of such classification is a determination by an authorized agency which is lacking here. The argument is unpersuasive.

We cannot fault the view that an authorized agency determination is a present criterion for classification as section 103 gas. As related, the definition of that classification in 15 United States Code section 3313(a) is "natural gas determined in accordance with section 3413 of this title to be produced from any new, onshore production well . . . ." Determination in accordance with section 3413, among other things, requires a determination by a state or federal agency with regulatory jurisdiction over the production of natural gas.

Anacapa goes wrong at the outset in asserting that the arbitrators' reasoning is necessarily premised on the conclusion that the gas from the four wells is section 103 gas. The pertinent "category" is that provided in 15 United States Code section 3331(a)(2), rather than section 3313(a). Section 3331 decontrols the price on natural gas "produced from any new, onshore production well (as defined in *section 3313(c)* of this title)." (Italics added.) The definition in section 3313(c) does not include as a criterion a certification or determination by a regulatory agency.

Anacapa's reply to this is that this plausible reading of the NGPA decontrol provision is incorrect. As we have been at pains to say, it is not enough that the reading is incorrect, i.e., different than the construction we would give if called upon to interpret this law under a *Parsons* review. If the arbitrators have selected a reading that is within the range of ambiguity and imported that into their construction of the contract, Anacapa cannot prevail.

Anacapa argued as follows to the superior court. The decontrol provision, 15 United States Code section 3331(a), "says that the provisions of the NGPA applying ceiling prices to § 103 gas cease to apply on January 1, 1985. Thus, in order to qualify for price deregulation as an NGPA § 103 well, the well must first *qualify* for NGPA § 103 ceiling price treatment." However, section 3331(a) does not say what Anacapa asserts it says. It says "the provisions of part A of this subchapter respecting the maximum lawful price for the first sale of each of the following categories of natural gas shall . . . cease to apply effective January 1, 1985." The "provisions of part A" include *all* of the provisions establishing wellhead price controls, not merely the provision pertaining to section 103 gas. In order to rule out ambiguity and compel the reading advanced by Anacapa the statute would have to say that section 103 natural gas is decontrolled if it meets the additional limiting criteria.

Anacapa also argues that its view of the meaning of 15 United States Code section 3331 is compelled because it is the view that has been taken by the Federal Energy Regulatory Commission (FERC), the agency to whom the duty of enforcement of the NGPA is assigned. Anacapa points to FERC regulations promulgated under the NGPA after the contracts here were formed. These regulations show that FERC reads section 3331 as Anacapa believes it should be read. (See 18 C.F.R. pt. 272.)

If this were a review of the matter in the posture of *Parsons* we would find Anacapa's argument a strong one, perhaps even compelling. ■ Under federal law if a federal agency charged with administering a federal statute issues an interpretive regulation not in conflict with the statute, a court is obliged to defer to the agency. (*Chevron U.S.A.* v. *Natural Resources Defense Council, Inc., supra*, 467 U.S. at p. 843 [81 L.Ed.2d at p. 703]; also see Davis, Administrative Law of the Eighties (1989) ch. 29.) On the record before the arbitrators the meaning we would likely assign the contract provision is that deregulation is measured by federal law, as it stood at the time deregulation is claimed to have occurred.

■ However, that is not the only meaning that can be assigned without arbitrarily remaking the contract of the parties. We need not inquire whether we would be required to reverse the decision of a lower court which made the same decision as the arbitrators in this case. Under the applicable narrow standard of review our inquiry terminates upon the conclusion that the meaning assigned by the arbitrators is not an arbitrary remaking of the contract.

PG&E argued to the arbitrators that the intended meaning of the term "deregulation" in the contract repricing provision was deregulation under the

NGPA as it stood at the time the contract was formed. It contended that the provision was drafted in contemplation of "deregulation dates" contained in the NGPA, including the January 1985 deregulation date under the statutory language of 15 United States Code section 3331. If the contract is construed as of the date of its formation it is well within the confines of semantic permissibility, for reasons given, to say that it calls for repricing at market price levels as of January 1985.

That FERC, several years later, might construe the law differently (for its own purposes) is not an outcome that Anacapa and PG&E must be deemed to have certainly expected at the time of contract formation. That the contract price would remain fixed above market levels on several contingencies—that the market price dropped below ceiling price, that Anacapa declined to apply for certification, and that FERC construed the NGPA as it has—is not a risk that was manifestly assigned to PG&E at the time of contract formation. It is not an arbitrary remaking of the contract, that is a reallocation of risks plainly allocated by the contract, to read the contract as it could reasonably be read at the time of formation in these circumstances. We conclude that the claim of error in the construction of the repricing provision of the contract as to the first Anacapa contract has no merit under the applicable standard of review.

Lastly, Anacapa suggests that the foregoing argument rests too heavily upon the ambiguity of the term "deregulation" as opposed to "ceiling prices . . . cease to apply." It argues that the amendment of subparagraph 7(b) of the contract, "Effective upon deregulation of price controls under any Federal or State legislation," is given inappropriate prominence. It suggests that, because of the phrasing of the letter signed by the parties, the clause concerning cessation of application of "ceiling prices" is a *condition precedent* to the application of subparagraph 7(b). Anacapa finds this condition in the text of the letter saying: "[a]t *such time as ceiling prices* under the Natural Gas Policy Act of 1978 . . . *cease to apply* to all or any part of [Anacapa's] gas, *then the provisions of subparagraph 7(b) shall apply* to the redetermination of the price to be paid for gas delivered . . . ." (Italics added by Anacapa.) Therefore, it reasons, the "ceiling prices clause" is a higher source of meaning. We disagree that this construction is compelling.

The two phrases are alternate formulations of the same concept and neither has semantic primacy. That which counts as a cessation of ceiling prices is also that which counts as a deregulation for the reason that ceiling prices are the product of regulation. The cessation of ceiling prices does not give rise to a deregulation—it *is* a deregulation. In any event neither formulation weighs critically in Anacapa's favor.

To the extent that semantic primacy is to be allocated between the two formulations it would seem that the formulation chosen for inclusion in the formal text of the contract document would have the superior claim. The purpose of the letter is to achieve an amendment of the formal contract document and that amendment *is* the new language of subparagraph 7(b).

### D.

That brings us to Anacapa's claim that the arbitrators erred in construing the repricing provision under the second contract. Under that contract the arbitrators held that gas from two of Anacapa's wells meets the criteria for decontrol of prices under subdivision (a)(3) of 15 United States Code section 3331, "Intrastate contracts in excess of $1.00.—Natural gas sold under an existing contract, any successor to an existing contract, or any rollover contract, if [such gas meets two conditions that are undisputed here]." Anacapa contends that this holding rests on an impermissible reading of the contract and the NGPA. It argues this is so because natural gas subject to this subdivision under a contract, as here, where the parties could set prices by negotiation, is still subject to price limits, under section 3331(e). Once again, the construction given by the arbitrators is not an arbitrary remaking of the contract between the parties.

As related, PG&E argued to the arbitrators that the intended meaning of the term "deregulation" in the contract repricing provision was deregulation under the NGPA as it stood at the time the contract was formed. It contended that the repricing provision was drafted in contemplation of "deregulation dates" contained in the NGPA, including the January 1985 deregulation date under the statutory language of 15 United States Code section 3331. With respect to the wells under the second contract, PG&E contended that the elimination of the original set of price controls under section 3331(a)(3) was a deregulation triggering the repricing option despite the imposition of a new set of price limits upon any negotiated price under the contract. Although this is not the only plausible reading of the contract it is one that is semantically permissible.

That this meaning could be assigned to the contract phrase "deregulation of price controls under any Federal . . . legislation" finds support in the consideration that the new price limit would be lower than the price under section 102 of the NGPA. As related, the letter agreement amending the contract calls for the highest applicable price under section 102 of the NGPA until the repricing provision is invoked. Under the original ceiling prices section 105 gas is eligible for a price at this rate. (15 U.S.C. § 3315(b)(1)(B).) However, the new limit for section 105 gas provided under 15 United States Code section 3331(e) for the operation of negotiated price

clauses in contracts is lower. (15 U.S.C. § 3315(b)(3)(A).) Hence, if the repricing clause were not meant to be invoked as to section 105 gas, the contract would facially call for an illegal price. Without some operation of the repricing clause, there is no establishment of price under an indefinite price escalator clause, upon which the limit in 15 United States Code section 3331(e) would operate.

PG&E's proffered usage of the term "deregulation" in the contract is supported by the following similar contemporary usage in the House Conference Report concerning the NGPA: "Natural gas sold under an existing intrastate contract . . . is deregulated as of January 1, 1985, [if 15 United States Code section 3331(a)(3) criteria are met]." (1978 U.S. Code Cong. and Admin. News, at p. 9008.) Similar usage is also employed in *Martin Exploration Management Co.* v. *F.E.R.C.*, *supra*, 813 F.2d at pages 1072-1073. "In essence, [15 United States Code section 3331(a)(3)] deregulates intrastate gas that is sold under a contract that set a price in excess of $1.00 on December 31, 1984. [¶] Once such gas has been deregulated, it can become subject to a 'special rule' limiting the price that can be obtained pursuant to an indefinite price escalator clause. Conf.Rep. at 83. Congress was concerned that 'following deregulation, the operation of indefinite price escalator clauses . . . could operate to increase rapidly intrastate gas prices following deregulation.' " (*Ibid.*, fn. omitted.)

Lastly, Anacapa argues that even if the reasoning of this part is correct that the shift from section 105 to the new special limit can be a "deregulation," it cannot be a cessation of "ceiling prices" as required. The answer is: Yes it can. The phrase "ceiling prices cease to apply" in the letter means "deregulation." Deregulation can mean the January 1985 NGPA deregulation date as we have explained. If A = B and B = C, then A = C. The first set of ceiling prices ceased to apply on January 1, 1985.

Having found that the term "deregulation" in the contract employed the same usage, referring to the elimination of the original ceiling prices under the NGPA, the arbitrators could reasonably construe the repricing provision as applicable to the section 105 gas under the second contract as of the date of that elimination, regardless of the imposition of another price limit in futuro. This reading of the contract, in view of the considerations advanced by PG&E, even if an error of law, in the sense that we might find it unpersuasive under a *Parsons* standard of review, does not count as an arbitrary remaking of the contract. We conclude that the claim of error in the construction of the repricing provision of the contracts as to the second Anacapa contract has no merit under the applicable standard of review. For all the foregoing reasons the trial court exceeded its powers in vacating the award as to the application of the repricing term of the contracts in this case.

## III

### *The Arbitrators' Construction of the Contract Concerning the Exclusion of Four Wells From the Original Contract Does Not Arbitrarily Remake the Contract*

Anacapa's next claim concerns issue B under the statement of issues tendered to the arbitrators. ■ Anacapa contends that the arbitrators committed errors of law in concluding that four wells were not on land included in the contract at the time the NGPA was enacted. If the wells were not on lands covered by the contracts prior to the enactment of the NGPA, they were subject to the lower ceiling price for section 109 gas rather than that applicable to section 105 gas. PG&E sought recovery of the difference between the section 109 price and the section 105 price it had been paying; approximately $1,846,000. The dispute concerns the scope of the original contract. PG&E claimed that the contract only pertains to lands described in the writing. Anacapa claimed that other lands not described were intended to be covered and were covered by virtue of oral promises. The arbitrators concluded that the original written agreement did not cover the disputed wells, and that the evidence of an oral agreement was insufficient.[7] That conclusion is not subject to judicial review.

The questions concerning the existence of collateral or subsequent oral agreements including the land at issue under the pre-NGPA contracts turn on factual determinations made by the arbitrators concerning the conduct of the parties. The essential holding of the arbitrators is as follows. "On the written record, the wells in question did not qualify for pricing under section 105. [¶] Anacapa contends, however, that the lands on which the wells were drilled were committed to PGandE by an oral agreement entered into before

---

[7]The arbitrators supported this conclusion, in part, with an *alternate* rationale. The award says that as to the contention that an oral agreement was made during certain specific negotiating sessions, the evidence showed that these particular sessions were concluded with an understanding that PG&E would prepare a writing that would be an integration, that PG&E did so, and that the claimed oral agreements were not of the kind which naturally would be made separate from the writings. Therefore, the arbitrators concluded these writings could not be contradicted by the claimed oral agreements under the parol evidence rule. Anacapa claims that, regardless of the success of its other contentions, the trial court correctly vacated this portion of the award under section 1286.2, subdivision (e), which requires that an award be vacated if a court determines a party was prejudiced "by the refusal of the arbitrators to hear evidence material to the controversy . . . ." Anacapa argues that the trial court correctly concluded the arbitrators had misapplied the parol evidence rule under the mistaken view that it bars evidence of an oral agreement made subsequent to a written contract.

This argument is thoroughly unpersuasive. The arbitrators did not refuse to hear any of Anacapa's evidence. The award does not show the claimed misunderstanding of the parol evidence rule. The claimed error in the application of the rule only inhabits one branch of two alternate grounds for the conclusion adverse to Anacapa, and either will suffice.

the effective date of NGPA and that, therefore, the gas produced from the wells was correctly priced under section 105(b)(1)(B). Neither the terms of the alleged oral contract nor the time when it was made were clearly established by the evidence."

For reasons given earlier in this opinion, in the absence of a specific agreement to the contrary, the factual findings of the arbitrators, mistaken or not, are final and not subject to judicial review. There is no provision of the submission agreement which provides for judicial review of the factual determinations of the arbitrators. The superior court erred in vacating the award as to the portion of the award granting PG&E repayment of over-charges because of the incorrect characterization of the four disputed wells.

Nonetheless, Anacapa contends that the determination that these four wells were not covered under the pre-NGPA agreement of the parties and hence not eligible for section 105 pricing is beyond the power of the arbitrators because it contradicts the 1980 and 1981 letter amendments to the original contract. The letters amended the original contract by altering the original maps to include the new wells showing them as proved lands. The text of each amendment is introduced by the following statement in PG&E's letters: "You [Anacapa] have advised us that you have recently completed two new wells, [e.g., Frye No. 2], on lands covered by [the original contract] and request that said wells be covered as additional wells under the terms and conditions of said agreement." Anacapa argues that the arbitrators in effect rewrote the contract by determining that this statement was mistaken. Anacapa argues that the issue whether the wells are covered under the original agreement does not arise "under" any provision of the contract, and that the arbitrators must "take the contract as they find it." We disagree.

The contract provides for arbitration of "any other dispute . . . arising between Buyer and Seller under any provision hereof . . . ." The dispute may be said to arise under a provision of the contract, since the contract provides that the pricing shall in no event exceed NGPA ceiling prices. The general canon is to read arbitration clauses broadly, construing ambiguity in favor of arbitration. If the wells are in fact not eligible for section 105 pricing then "under" the pricing provision of the contract, there has been an overcharge.

Alternatively, it is questionable whether the prefatory statement in PG&E's letter concerning the lands being covered under the initial agree-ment is a provision of the contract. The statement, in the nature of a recital, is not included in the contract amendment itself. Anacapa argues that if the statement is taken as a recital then it must be conclusively presumed to be

true under Evidence Code section 622. Assuming for the sake of discussion that section 622 is applicable to an arbitration and that an error of law in failing to apply it were cognizable in review of an award, all that the statement says is that Anacapa told PG&E that the wells were on land covered by the original contract. Conclusively presuming that Anacapa made the statement does not render the statement incontrovertible.

## IV

### *The Award Does Not Arbitrarily Remake the Contract in Holding That PG&E Has No Obligation to Take Gas to Prevent Drainage or Physical Damage to Anacapa's Wells*

The final dispute, under issue C., concerns the obligation of PG&E to act to avoid causing physical harm to Anacapa's wells or Anacapa's interest in obtaining gas from reservoirs tapped by others by failing to take enough gas. The claim is posed under the doctrine of good faith and fair dealing. The written contract does not obligate PG&E to take gas from Anacapa. It provides that regardless whether gas is taken PG&E must pay Anacapa as if it had taken one-third of the maximum delivery rate available. ▮▮▮ Anacapa claimed PG&E should nonetheless be compelled to take gas at a rate sufficient to prevent damage to the wells by water infiltration and to prevent Anacapa's neighbors who might be tapping the same gas reservoir from obtaining a disproportionate amount of the gas. The arbitrators found that these issues were discussed in the negotiation of the contracts and concluded that the failure to restrict PG&E activity with respect to them was an allocation of the risk of the ill effects of the contingency of refusal to purchase any gas. "We conclude that PGandE has no obligation to avoid causing drainage of gas from Anacapa's wells or to take gas at rates of production sufficient to avoid damage to the wells." There is no basis to impugn this finding under the applicable standard of review.

▮▮▮ The implied covenant of good faith and fair dealing in the performance of a contract is one of contract law. (See *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684 [254 Cal.Rptr. 211, 765 P.2d 373].) "The rules which govern implied covenants have been summarized as follows: '(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant

where the subject is completely covered by the contract.'" (*Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 142 [280 P.2d 775], citation omitted.) The reach of the governing law depends upon the contract purposes and looks to commercial standards of fair dealing in the transaction. (See *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; Rest.2d Contracts, § 205, com. a.)

■ Anacapa contends that the finding of the arbitrators presents an error of law, in essence, because it permits PG&E to manipulate drainage or the prospect of damage to pressure Anacapa to renegotiate the contract. Again, we note that Anacapa failed to pursue the issue of adhesion before the arbitrators as a ground for construction of the contracts. We also reiterate that the standard of judicial review is not mere error of law but an error so egregious as to amount to an arbitrary remaking of the contract. In this context that means an error of law that discards an unmistakable expectation of an implied covenant under the contract.

PG&E adduced evidence that the problems and risks associated with drainage and potential for physical damage if gas was not taken continuously are commonly known in this industry, that the right to "shut in" wells, by taking no gas, was valuable to PG&E to handle fluctuating demand, that the right was bargained for in light of the risks of drainage and physical damage, and that Anacapa sought unsuccessfully in the negotiation of the contract to obtain provisions requiring PG&E to take delivery of its gas in a manner that would preclude disadvantageous drainage.

This is not a case where the inference is compelled that Anacapa reasonably presupposed that drainage protection and damage protection would generally be provided by PG&E. Both the history of the negotiations and the contract term providing minimum payments regardless whether gas is taken support the contrary view. In this setting we cannot say that the finding of the arbitrators concerning an implied covenant to take gas in a manner protective of Anacapa's interests is an error of law which discards an evident contractual expectation of Anacapa to the contrary. Hence, the superior court erred in setting aside the award as to these issues.[8]

---

[8]Anacapa also suggests that the award on the right of PG&E to shut in Anacapa's wells is broad enough to permit PG&E unconscionably to coerce concessions in future contractual arrangements. That issue is not before us. The meaning of an award, as with an opinion, must be derived from the facts to which it is applied. On the facts here PG&E shut in the Anacapa wells during a fair weather spell when market demand for gas was low. It proposed to abort the shut in and purchase the gas from Anacapa at market prices below ceiling prices on the rationale that in periods of low demand it purchases gas from the lowest price producers. A resort to alternative sources of gas in these circumstances does not constitute an

## V

### No Action That Is Compelled Under the Award
### Presents a Conflict With Public Policy

 Anacapa's residual contention is that the portion of the arbitration award construing the contract to permit repricing compels an illegal act or an act violating public policy. It argues that the determination that some of its gas was deregulated as natural gas produced from new onshore production wells was not arbitrable and that the arbitration of that point itself violates public policy. As appears, this argument confuses an error in legal reasoning with ordering an illegal act. Anacapa also argues that under the award it is illegally compelled to sell section 109 gas for a price that exceeds the section 109 ceiling price. This argument is not one that Anacapa may raise since it is not aggrieved.

 Courts will vacate or correct an award at the behest of a party who demonstrates it is invalid insofar as it orders an illegal act. (See e.g., *Black* v. *Cutter Laboratories* (1955) 43 Cal.2d 788, 800 [278 P.2d 905] ["[H]ere the very award itself is illegal in that it orders reinstatement as an employee [a Communist]"]; *Evans Products Co.* v. *Millmen's Union No. 550* (1984) 159 Cal.App.3d 815, 819 [205 Cal.Rptr. 731] [under the federal arbitration act courts are "not bound to defer to an award that actually violates the law or any explicit and well defined and dominant public policy."].)[9] Arbitrators "exceed their powers" in making an award insofar as the award compels a party to violate the law if given judicial enforcement. (See *Black, supra,* 43 Cal.2d at p. 798.) This stems from the general principle that the judiciary will not enforce a contract so as to compel the performance of an illegal act. (See *Evans Products Co., supra,* 159 Cal.App.3d at p. 819.)

---

unconscionable use of the power to shut in. We decline to speculate whether the language of the award might be construed on some hypothetical facts to allow an unconscionable use of the power to shut in. That occasion may never arise and, if so, is subject to arbitration.

[9]There is also a potential related exception to nonreviewability "when a party claims illegality affects only a portion of the underlying contract" that is the subject of the arbitration and enforced thereby. (See *Moncharsh,* 3 Cal.4th at p. 32.) "We recognize that there may be some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when a party claims illegality affects only a portion of the underlying contract. Such cases would include those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights. [Citation]." (*Ibid.*) Insofar as Anacapa's complaint is that, if the contract calls for the repricing as directed by the award that portion of the contract is illegal, it fails under *Moncharsh.* For the reasons given in the text we discern no statutory right afforded Anacapa under the NGPA that is encroached upon by the contract as construed and enforced in the arbitration award.

Hence, we look to the doctrine pertaining to unenforceability of contracts.[10] (Cf. Rest.2d Contracts, §§ 178-185.)

The general rule as to unenforceability is set forth in section 178, subdivision (1) of the Restatement Second of Contracts. "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Sometimes the result of application of the rule is sweeping. However, this is not necessarily so, and in many circumstances part of an agreement may be enforceable even though the rest is unenforceable. (See Rest.2d Contracts, §§ 183-185.) For example, a promise to pay interest at a rate above the highest permissible legal rate may be enforceable up to the highest permissible legal rate. (See *id.* § 184, com. b, illus. 5.) With these considerations in mind we turn to Anacapa's particular claims of unenforceability.

 Anacapa first claims that the effect of the NGPA is to render the determination of the question of deregulation nonarbitrable. Anacapa submits that the buyer and seller of gas could not simply determine for themselves that their transaction is not subject to NGPA ceiling prices. Hence, they cannot indirectly authorize an arbitrator to do so. However, it is not the case that any error in construction of the NGPA concerning applicability of ceiling prices in the course of arbitration warrants vacating the award as in conflict with public policy. That is overblown, as noted in *Interinsurance Exch.* v. *Bailes* (1963) 219 Cal.App.2d 830, 836 [33 Cal.Rptr. 533]: "While, in one sense, all rules of adjective and substantive law set forth the 'public policy' of the state, there is a vast difference between the enforcement of a void contract and the mere misunderstanding or misapplication of rules of law involved in the application to a particular dispute of a [valid contract] . . . ."

The public policy core of the NGPA is remarkably compact. If the sale of gas is for a price permitted under the act, at or below the highest applicable

---

[10]The background considerations which underpin this doctrine are noteworthy. "In general, parties may contract as they wish, and courts will enforce their agreements without passing on their substance. Sometimes, however, a court will decide that the interest in freedom of contract is outweighed by some overriding interest of society and will refuse to enforce a promise or other term on grounds of public policy. Such a decision is based on a reluctance to aid the promisee rather than on solicitude for the promisor as such. Two reasons lie behind this reluctance. First, a refusal to enforce the promise may be an appropriate sanction to discourage undesirable conduct, either by the parties themselves or by others. Second, enforcement of the promise may be an inappropriate use of the judicial process in carrying out an unsavory transaction. The decision in a particular case will often turn on a delicate balancing of these considerations against those that favor supporting transactions freely entered into by the parties." (Rest.2d Contracts, Introductory Note to ch. 8, vol. 2, p. 2.)

ceiling price if any, there is no public policy against the enforcement of the contract of sale. If the parties enter into a contract for the sale of gas and it is manifest that they have presupposed an utterly erroneous legal view of the characterization of the gas for purposes of the NGPA, that is immaterial with respect to a claim of public policy transgression so long as the price actually paid for the gas is not unlawful. The same holds true where the price is set under a contract by means of an arbitration. Hence, Anacapa's generalized claim that the award is unenforceable with respect to the repricing provision because it rests upon an incorrect view of the need for an agency certification of the character of some of the gas as section 103 gas has no merit.

The award can only be said to violate the public policy manifest in the NGPA insofar as it compels payment by PG&E of a price for Anacapa's gas that exceeds an applicable ceiling price. Moreover, under the doctrine of unenforceability of contract terms, at most the award's terms should only be denied judicial enforcement insofar as they call for a price that exceeds an applicable ceiling price. (See Rest.2d Contracts, § 184.) The appropriate remedy, if any, would be to correct the award pursuant to section 1286.6, subdivision (b). (See § 1286.2, subd. (d).) However, neither party in this case has sought that relief.

Anacapa offers only one claim that the award may result in a payment that exceeds an NGPA ceiling price; it is limited to gas from four of the wells under one of the contracts, for part of the period following January 1, 1985. Anacapa cannot employ this claim as a stalking horse to obtain review of the bulk of the award as to gas from other wells. Anacapa is not aggrieved insofar as the award grants it too high a price for its gas. More importantly, even if Anacapa's legal theory is correct as to this limited portion of the gas in issue, the award does not compel Anacapa to perform an illegal act. It may simply decline to accept payment above the level it contends exceeds the federal price ceiling.

In the light of these considerations and the present posture of the case, we find no warrant to uphold the action of the trial court based upon Anacapa's claim that the award may result in a violation of the NGPA. The action of the trial court was not founded upon this ground nor would the ground support the action. Anacapa is under no legal compulsion to violate the NGPA by confirmation of the award.

### DISPOSITION

Let a peremptory writ of mandate issue commanding the superior court to rescind its order vacating the arbitration award and granting Anacapa

ancillary relief and issue a new order confirming the arbitration award.

Sparks, J., and Raye, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied September 2, 1993. Panelli, J., and Baxter, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.