Filed 5/14/15  Kapur v. Trumbly CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RAVI KAPUR et al., | C076804 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. 34201300148233CUMCGDS, 34201400159970CUPAGDS) |
| v. | |
| WARREN TRUMBLY et al., | |
| Defendants and Respondents. | |

Plaintiffs Ravi Kapur, Nalini Kapur, and Rishi Kapur (jointly the Kapurs) appeal from a judgment in which the superior court denied a petition to vacate an arbitration award and granted a competing petition to confirm that award.[1]  In the arbitration award, the arbitrator determined that defendants Jeremy and Robyn Noonan were members of a

---

[1]    The Kapurs also appeal from an order in a related case that was essentially identical to the judgment we address, but (as we will explain) that order was not appealable and therefore we will dismiss the appeal from it.

1

limited liability company because they had made their required capital contributions to the company and that defendant Brad Donaldson originally held his membership in the company in trust for defendants Warren and Linda Trumbly but later returned that membership interest to the Trumblys. The Kapurs contend the arbitrator exceeded his powers in making these determinations because the arbitrator "changed the language in the Operating Agreement and Asset Purchase Agreement to [make these determinations] . . . without applying California's law of [contract] reformation" and thereby "failed to apply California law as he was required to do by the arbitration agreement." As a result, the Kapurs contend, the arbitration award "must be vacated."

Like the superior court, we find no merit in the Kapurs' arguments. The arbitrator did not, either expressly or implicitly, reform either the operating agreement or the asset purchase agreement to make the determinations he did regarding the Noonans, Donaldson, and the Trumblys. Instead, the arbitrator only interpreted the agreements in reaching the conclusion that the Noonans had made their required capital contributions to the company and that Donaldson held his interest in the company for the benefit of the Trumblys. Because the arbitrator only interpreted the agreements, and did not reform them, he did not exceed his powers, and the superior court properly denied the petition to vacate the award and granted the petition to confirm it.

FACTUAL AND PROCEDURAL BACKGROUND

We take the pertinent factual background largely from the arbitrator's award.

Warren and Linda Trumbly are husband and wife, Robyn Noonan is their daughter, and Jeremy Noonan is Robyn's husband. Nalini Kapur is the mother of Ravi and Rishi Kapur is the brother of Ravi.

Linda owned a company called Broadland Properties, Inc. (Broadland), which owned a television station with the call letters KAXT. Linda's ownership interest in Broadland was a community property asset that belonged equally to Warren, who himself

2

had been involved in the television industry for over 40 years. Ravi is a journalist who had worked in television for 20 years as an anchor, reporter, and producer.

Around April 2008, Warren asked Ravi if he knew people who might want to invest in KAXT to assist in changing the station's broadcasting from analog to digital, among other things. Thereafter, both Warren and Ravi tried to spur investment in the station, with a target of $300,000, but to no avail. Accordingly, Ravi brought his mother and brother onboard, and the three of them agreed to invest $300,000 in the station as a group. Warren thought KAXT's broadcasting license and assets were worth $1 million, and he proposed that the Kapurs receive a 30 percent ownership stake for their investment. The Trumblys and the Kapurs signed a memorandum of understanding on those terms, but following further negotiations it was determined that the Kapurs would receive a 42 percent ownership stake instead.

In May 2009, the Trumblys, the Kapurs, the Noonans, Donaldson, and three other individuals entered into an operating agreement for a limited liability company to be known as KAXT, LLC (hereafter, the company).[2] Exhibit B to the operating agreement specified the capital contributions and voting shares of each of the 11 members of the company. Donaldson's contribution was shown as "**$250,000** LEGAL SERVICES," for which he was to have a 20 percent voting share. The Noonans' contribution was shown as "**$75,000** LOAN" for each of them, with each to have a 13 percent voting share. The Kapurs were shown as contributing a total of $430,000 in loans and services with cumulative voting shares of 42 percent. Warren's contribution was shown as "**$25,000** ASSETS," for which he was to have a 2.5 percent voting share, and Linda's contribution was shown as "**$75,000 --** ASSETS & LICENSE," for which she was to have a 4.5 percent voting share.

---

[2] The three other individuals were Herbert Alvarado, Sam Sutton, and Alicia Torres. Together, the operating agreement gave them a 5 percent voting interest in the company.

3

In July 2009, the company entered into an asset purchase agreement to purchase the licenses and other assets of the television station from Broadland. Section 1.3 of the asset purchase agreement -- "Purchase Price and Payment" -- provided as follows: "In consideration of the assignment by Seller to Buyer of the Licenses and the sale by Seller to Buyer of the Assets, respectively, Buyer shall cancel all indebtedness of Seller, including any obligation that may exist for any of Seller's owners, as listed in *Exhibit C* hereto. The debt cancellation shall be assigned a current value of Eight Hundred Fifty Thousand Dollars ($850,000.00), regardless of the amounts or terms or conditions set forth in any instruments of indebtedness ('*Purchase Price*'). Seller and Buyer agree that the total amount of indebtedness being cancelled equals or exceeds the Purchase Price."

Exhibit C to the asset purchase agreement identified loans made to Broadland by the Kapurs, services provided to Broadland and Warren by Donaldson, services provided to Broadland by the Noonans, and services provided to Warren by Jeremy Noonan as among the "**OBLIGATIONS AND INDEB[T]EDNESS TO BE CANCELLED**." Exhibit C did not include any specific amounts or descriptions for any of the loans or services that were being canceled.

Donaldson never attended a meeting of the company and never voted on any company matters. Instead, he transferred his membership to the Trumblys in January 2010, and thereafter the Trumblys apparently voted the interests that had been identified as Donaldson's in the operating agreement. As will be seen, the Trumblys later claimed that Donaldson had, from the outset, held his voting interest in the company in trust for the benefit of the Trumblys.

In 2012, two entities made offers to purchase KAXT's license and assets. Ravi did not want to sell, and his mother and brother supported him. Then, at a meeting of the company's members in October 2012, the Kapurs brought an attorney who claimed the Kapurs actually held the majority of voting interests in the company.

4

In January 2013, all of the members except the Kapurs voted to approve the sale of KAXT's license and assets for $10.1 million. The Kapurs refused to recognize the vote as valid, so the other members (with the exception of Sutton) commenced an arbitration proceeding in Sacramento County under the arbitration clause in the operating agreement, seeking a declaration validating the vote to sell. The Kapurs made various counterclaims in the arbitration, including that Donaldson was never a member of the company and that neither Donaldson nor the Noonans ever provided their required capital contributions.

In February 2013, the Kapurs commenced an action against Warren and the company in Santa Clara County Superior Court, claiming Warren had breached an agreement with them not to change any locks or passwords at the station and seeking to have a receiver appointed to manage the company.[3] In April 2013, Warren moved to change venue to Sacramento County because of the arbitration proceeding pending there. That motion was granted in June, and in July the Sacramento County Superior Court took over the case and renumbered it as case No. 34201300148233CUMCGDS (hereafter, case No. 33).

In September 2013, the arbitrator issued his initial (phase 1) award in which he affirmed the validity of the sale and rejected the Kapurs' contentions that Donaldson was never a member of the company and that Donaldson and the Noonans had never provided their required capital contributions to the company. The arbitrator concluded that Donaldson "held his interest [in the company] for the benefit of the Trumblys, and properly returned it to them." As for the Noonans, the arbitrator concluded they were not required to contribute new loans as their capital contributions to the company; instead,

---

**3**     To obtain a more complete understanding of the convoluted procedural background of this appeal, on our own motion we take judicial notice of the entire superior court file in Sacramento Superior Court case No. 34201300148233CUMCGDS. (Evid. Code, § 452, subd. (d).) As will be seen, the action the Kapurs filed in Santa Clara County ultimately became this Sacramento County case following a change of venue.

5

"the Trumblys were indebted to the Noonans," and "[t]herefore, [the company] was required to . . . cancel those debts."

In January 2014, the phase 1 award was incorporated into the final arbitration award. In February, Trumbly and the company filed a petition in case No. 33 to confirm the final arbitration award. The hearing on the petition was set for March 4. In response, the Kapurs filed what purported to be an opposition to the petition to confirm the award *and* a petition to vacate the award. In that document, the Kapurs argued that the arbitrator exceeded his powers because he reformed the operating agreement in violation of California law: (1) by eliminating the requirement that the Noonans make capital contributions to the company; and (2) by identifying Donaldson's membership interest as being held in trust for the Trumblys. The Kapurs also pointed out in a footnote that "numerous parties to that arbitration [wer]e not parties to [case No. 33]" and observed that a petition to confirm an arbitration award must " 'name as respondents all parties to the arbitration.' " (See Code Civ. Proc., § 1285.)

The trial court issued a tentative ruling denying both petitions without prejudice because the arbitration involved individuals who were not parties to case No. 33, and the requirement that the Kapurs had pointed out regarding a petition to confirm an arbitration award also applies to a petition to vacate an arbitration award -- all parties to the arbitration must be named as respondents. Trumbly's attorney tried to remedy the problem at the last minute by filing two documents on the day of the hearing: one that purported to constitute an appearance, waiver of notice, and joinder by Linda, the Noonans, Torres, Alvarado, and Donaldson; and another that purported to be a revised petition to confirm the arbitration award, which named those same individuals as petitioners along with Warren and KAXT, even though these additional individuals were not parties to the original complaint in the action. Despite these actions, the court took the matter under submission and continued the hearing to April 16 to allow the parties the opportunity to correct the problem.

6

On March 7, the Kapurs filed a petition to vacate the arbitration award in a new proceeding (case No. 34201400159970CUPAGDS; hereafter, case No. 70) in which they named as respondents all of the other parties to the arbitration.[4] They also filed a notice that this new case was related to case No. 33. On March 24, defendants filed a petition to confirm the arbitration award in case No. 70. On March 28, the court ordered the two cases related and subsequently assigned both cases to be heard in the same department on April 16 on the competing petitions to confirm and vacate the arbitration award.

On April 24, following the hearing on April 16, the court issued its ruling granting the petition to confirm the arbitration award and denying the petition to vacate it. The court concluded that the Kapurs had failed to show that the arbitrator either exceeded his powers by employing a completely irrational construction of the contract or failed to apply California law as required by the arbitration clause.

On May 1, the court entered a formal order on its ruling in case No. 33. No such order was entered in case No. 70.

On June 23, the Kapurs filed a notice of appeal in each case purporting to appeal from the May 1 order.

On September 19, the court entered judgment in case No. 70 on the petition to vacate the arbitration award. On November 24, pursuant to a stipulation of the parties, the court entered a corrected judgment in case No. 70 nunc pro tunc on the petition to vacate the arbitration award *and* the competing petition to confirm the arbitration award.

Meanwhile, in case No. 33, litigation continued following the order on the arbitration award. On April 30, the day before the formal order was entered, the Kapurs filed an amended complaint, to which Warren and the company demurred. In July, the trial court overruled the demurrer. Thereafter, Warren and the company filed a cross-

---

[4]     These parties consisted of the Trumblys, the Noonans, Torres, Alvarado, Donaldson, and the company. We will refer to this group jointly as defendants.

7

complaint, to which the Kapurs demurred. In September, Warren and the company filed a motion to compel arbitration and to stay the action. In October, the court granted that motion. Thereafter, the demurrer to the cross-complaint was dropped from the calendar because of the stay. No judgment has yet been entered in the case.

DISCUSSION

I

*Appealability And Timeliness*

The initial question for us to decide is whether the appeals are properly before us in both of the cases (case No. 33 and case No. 70) in which the Kapurs filed notices of appeal. We begin with case No. 70. In their reply brief, the Kapurs contend the corrected judgment the trial court entered in November 2014 is appealable under Code of Civil Procedure section 1294, subdivision (d), which allows an appeal to be taken from a judgment under the California Arbitration Act (Code Civ. Proc., § 1280 et seq.).

The Kapurs are correct. A judgment confirming an arbitration award is appealable (*Mid-Wilshire Associates v. O'Leary* (1992) 7 Cal.App.4th 1450, 1454), and the November 2014 judgment is such a judgment. What the Kapurs fail to address, however, is the fact that they did not file a notice of appeal from that judgment; instead, they filed a notice of appeal five months earlier from the May 2014 order -- an order that was not even entered in case No. 70.

For their part, defendants contend the Kapurs' notice of appeal in case No. 70 "may . . . be treated as a premature but valid appeal from the [November 2014] judgment." Defendants are correct. "The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment." (Cal. Rules of Court, rule 8.104(d)(2).) As there is no objection, we exercise our discretion to treat the notice of appeal filed June 23, 2014, as having been filed immediately after the entry of the

8

corrected judgment on November 24, 2014. Accordingly, the Kapurs' appeal in case No. 70 is properly before us.

The same cannot be said, however, about the Kapurs' appeal in case No. 33. No judgment has been entered in that case -- whether under the California Arbitration Act or otherwise; instead, the action remains pending, although it is stayed pending completion of the new arbitration the court compelled. While the court did enter an order in case No. 33 granting the petition to confirm the arbitration award and denying the petition to vacate it, and the Kapurs did timely appeal from that order, "[n]o appeal . . . will lie from an order *denying* vacation . . . of an arbitration award" (*Mid-Wilshire Associates v. O'Leary*, *supra*, 7 Cal.App.4th at p. 1454) and "[i]t is the judgment confirming an arbitration award, not the order granting request for confirmation, which is appealable" (*National Marble Co. v. Bricklayers & Allied Craftsmen* (1986) 184 Cal.App.3d 1057, 1060, fn. 1). Accordingly, in case No. 33, the Kapurs appealed from a nonappealable order, and a judgment has not yet been entered from which we could deem the Kapurs' appeal to have been prematurely taken from (as we have done in case No. 70). Accordingly, we will dismiss the appeal in case No. 33 as from a nonappealable order.

II

*The Arbitrator Did Not Reform The Agreements*

On appeal, the Kapurs contend that when the arbitrator excused the Noonans' failure to make their capital contributions to the company and identified Donaldson's interest in the company as being held in trust for the Trumblys, he arbitrarily remade the operating agreement and/or the asset purchase agreement and thereby acted in excess of his powers because he remade the agreements without applying the California law of reformation. We disagree.

"[W]ith limited exceptions provided by statute, an arbitrator's award is not reviewable for errors of fact or law." (*Pacific Gas & Electric Co. v. Superior Court*

9

(1993) 15 Cal.App.4th 576, 582 (*PG&E*).) One such exception is when the arbitrator's action exceeds his powers. Pursuant to the California Arbitration Act, an arbitration award must be vacated if "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4).)

In *PG&E*, this court held that an arbitrator exceeds his powers in construing a contract when the arbitrator "arbitrarily remakes the contract" and thus commits an "error so egregious that it produces a result completely outside the expectations of the parties to [the] contract." (*PG&E*, *supra*, 15 Cal.App.4th at p. 582.) "[S]uccess in vacating an arbitration award under this standard requires more than a mere conviction that another construction of the contract is plainly correct. . . . [A]rbitrators do not exceed their powers merely by reaching an erroneous decision. Nor does the standard . . . permit a court to usurp the power of the arbitrator by declaring the award's determination an abuse of discretion in the sense under which an appellate court may in some contexts intervene to overturn a mistaken position of a trial court as to which reasonable judges could differ. [Citation.] The test is one of arbitrariness, not correctness." (*Id.* at p. 594.)

With the foregoing standard in mind, we turn to the Kapurs' arguments.[5]

---

**5** The Kapurs ask us to take judicial notice of certain documents issued by the Federal Communications Commission "for the purpose of showing the considerable harm suffered by them due to . . . the arbitration award made in excess of the arbitrator's powers" confirming the sale of the station's license and assets. But the extent of any "harm" the Kapurs suffered because the arbitrator confirmed the sale for $10.1 million is not relevant to our determination of whether the arbitrator exceeded his powers on the grounds asserted by the Kapurs. Accordingly, we deny the Kapurs' request for judicial notice.

The Kapurs also ask us to take judicial notice of a recent statement of decision by a Santa Clara County Superior Court judge in another lawsuit involving some of the same parties involved in these appeals, asserting that the decision of that court "confirms" that the Noonans and Donaldson failed to make their required capital contributions. Acknowledging that this decision was not before the trial court here, the Kapurs assert

10

A

*The Noonans' Capital Contributions*

There was evidence before the arbitrator that the Noonans' capital contributions to the company consisted of the cancellation of a $150,000 debt they were owed arising out of a failed real estate investment with the Trumblys.  Specifically, the Noonans invested $150,000 with the Trumblys, but the investment failed.  Thereafter, Broadland assumed the Trumblys' $150,000 debt to the Noonans.  When the company was formed to acquire the television station assets from Broadland, the Noonans agreed to cancel the debt as their contribution to the company's capital.

The Kapurs contend "the Noonans' purported personal loan to the Trumblys in connection with the failed real estate transaction was never intended to be included in the transaction and never intended to constitute their capital contribution" for two reasons.  First, section 1.3 of the asset purchase agreement provided that the company would cancel "all indebtedness of [Broadland], including any obligation that may exist for any of [Broadland's] owners, *as listed in **Exhibit C** hereto*," (italics added) and (according to the Kapurs) "no loan from the Noonans was listed in Exhibit C."  Second, again according to the Kapurs, section 1.5 of "the Asset Purchase Agreement made clear that only debts pertaining to the business of the Station were to be assumed," and "[t]he

that we are "permitted to consider additional evidence in a case such as this" under Code of Civil Procedure section 909.  But this is not an appropriate case for the application of Code of Civil Procedure section 909.  (See *Monsan Homes, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830 [noting that "[t]he power to invoke the statute should be exercised sparingly, ordinarily only in order to affirm the lower court decision and terminate the litigation, and in very rare cases where the record or new evidence compels a reversal with directions to enter judgment for the appellant"], disapproved on another point in *Passavanti v. Williams* (1990) 225 Cal.App.3d 1602, 1607-1608, fn. 5.)  The decision as to whether the arbitrator exceeded his powers must be made on the evidence presented to the trial court here, not the evidence presented to another court in another proceeding.  Accordingly, we deny the Kapurs' second request for judicial notice also.

11

Noonans' purported personal loan to the Trumblys relating to the failed real estate deal had nothing to do with the Station's business." We find no merit in either argument.

First, with regard to exhibit C to the operating agreement, it is true that the exhibit does not expressly mention any "loans" by the Noonans, but instead refers only to "[s]ervices" provided by the Noonans to Broadland and by Jeremy individually to Warren. Nevertheless, it was not arbitrary for the arbitrator to construe the reference to "[s]ervices" in the asset purchase agreement as corresponding to the "loans" referenced in the operating agreement. That the parties themselves did not intend the two terms -- "loans" and "services" -- to be mutually exclusive is reflected not only in the treatment of the Noonans' capital contributions to the company but also in *Ravi's* contribution. Specifically, the operating agreement provided that Ravi's capital contribution was to be a $140,000 loan. Ravi himself testified, however, that his capital contribution included *services* he provided to the station -- specifically, "almost two years of work [he] did for the station without compensation." Thus, there was evidence the parties did not intend to strictly distinguish between loans and services when it came to capital contributions to the company, and therefore the arbitrator did not act arbitrarily in determining that the "[s]ervices" mentioned with respect to the Noonans in exhibit C to the asset purchase agreement corresponded to loans referenced in exhibit B to the operating agreement, which were to be canceled as part of the deal transferring ownership of the station from Broadland to the company.

Second, with respect to the argument based on section 1.5 of the asset purchase agreement, we agree with defendants that the Kapurs are erroneously conflating the *cancellation* of certain indebtedness, as provided for in section 1.3 of the agreement, with the *assumption* of other indebtedness, as provided for in sections 1.4 and 1.5 of the agreement. As we have explained, section 1.3 of the asset purchase agreement provided that the company was to acquire the television station's licenses and assets from Broadland by having the company cancel certain obligations Broadland and its owners,

the Trumblys, owed to members of the company. Sections 1.4 and 1.5 of the agreement then provided as follows:

"1.4  Liabilities Assumed by Buyer. Buyer agrees to accept and be responsible for only those liabilities accruing from operation of the Station on and after the Closing. Such liabilities shall include, but not be limited to, Seller's tower lease and studio lease and the programming and other contracts and agreements listed in *Exhibit D* hereto (collectively the '*Assumed Liabilities*').

"1.5  Excluded Liabilities. Buyer shall not assume or accept any liability for any liability or obligation of Seller that does not pertain to the operation of the Stations or pertains to the operation of the Stations prior to Closing, whether such liability be private or governmental, and regardless of whether such liability or obligation is asserted or comes to light before or after the Closing. Seller shall not assume or be responsible for any liability of Seller arising from the preparation or carrying out of this Agreement."

The arbitrator could have reasonably determined that the restriction in section 1.5 on the company's assumption or acceptance of liabilities not pertaining to the operation of the station had no bearing whatsoever on the liabilities that were being *canceled* under section 1.3 of the agreement. The agreement can reasonably be understood to provide that an obligation to a member of the company that was *canceled* in order to provide that member's capital contribution to the company was neither *assumed* nor *accepted* by the company because the cancellation meant it no longer existed. Thus, the restriction relating to liabilities not pertaining to the operation of the station simply had no application to the loan that was canceled to give the Noonans their ownership interest in the company.

13

It should also be noted that in determining that the Noonans made their capital contributions to the company as required by the operating agreement, the arbitrator referred to $200,000 in loans the Noonans made to Linda, which Jeremy testified were "to help the Trumblys with Broadland." Thus, even if the restriction in section 1.5 of the asset purchase agreement *did* apply to the loan or loans that were canceled to make the Noonans' capital contribution, it appears that restriction was satisfied. At the very least, it is clear that the arbitrator did not act *arbitrarily*, as required by *PG&E*, in determining that the Noonans made their required capital contributions to the company.

B

*Donaldson's Holding Of Membership In Trust For The Trumblys*

The arbitrator found that, from the outset, the ownership interest Donaldson took in the company was not for himself, but was held for the benefit of the Trumblys and belonged to them. According to the arbitrator, "[t]he apparent purpose for the Trust was [Warren's] concern that 'he had some preexisting problems with a variety of banks in his past real estate investment deals, it was a volatile situation' [citation] and apparently [he] did not want the banks to be attracted by the amount of his new investment."

The Kapurs contend that the operating agreement is "not susceptible in the least to" this idea because "the notion of Donaldson holding his interest in trust for the Trumblys completely contradicts his obligation to contribute $250,000 in legal services as a capital contribution, which is also included in the Asset Purchase Agreement." Accordingly, they contend the arbitrator had to remake the agreements to accept defendants' position that Donaldson held his interest in the company in trust for the Trumblys.

To the extent the Kapurs' argument rests on the proposition that Donaldson was supposed to contribute $250,000 in legal services but did not do so, the arbitrator rejected that argument, stating as follows: "[The Kapurs] mistake what was required here. [Defendants] were not called to provide new loans or money or services, and none of

14

them did.  Rather, they received their interests based on services or loans in consideration for what they had done for the Trumblys in the past.  The Trumblys believe they were obligated to pay their family and friends for what they had done for the Trumblys, and that indebtedness was to be cancelled by the Buyer (KAXT, LLC), 'including any obligation that may exist for any of Seller's owners' . . . .  The result was that [defendants] were accorded the interests they were assigned for what they had done in the past, and 'regardless of the amounts or terms or conditions set forth in any instruments of indebtedness.'  [Citation.]  Nor could that have been a surprise:  all the [defendants'] loans, services and equipment indebtedness the Buyer cancelled in accordance with the [asset purchase agreement] were, in the [agreement's] words, 'provided' -- an act in the past -- and accordingly the [asset purchase agreement] presented every item the Buyer cancelled in the past tense. . . .  [¶] . . . [¶]  The result is that the assets and those valuable Licenses assigned by the Trumblys to KAXT gave it life.  [Warren's] loyalty to family and friends he felt indebted to permit them to obtain the interests they were accorded, although he could have kept the interests for himself.  As for Donaldson, he held his interest for the benefit of the Trumblys, and properly returned it to them. . . .  The consequence was that the Kapurs were accorded and kept 42% of KAXT and [defendants] (including Sutton) 58%, still again exactly what the Parties agreed to, so [the Kapurs] lost nothing because of it."

From the foregoing, it is apparent that the essence of the arbitrator's decision was that the substance of the transaction was to give the Kapurs a minority ownership stake (42 percent) in the company, with the Trumblys and the others having the majority (58 percent interest).  For their part, the Kapurs contributed various loans and services in exchange for their minority ownership interest.  The Trumblys contributed the station's

15

licenses and assets, and instead of taking the remaining, majority ownership interest in the station for themselves, they agreed portions of that interest would go to family (the Noonans) and others, to whom they were indebted, in exchange for cancellation of that indebtedness.  As for the ownership interest nominally assigned to Donaldson, instead of taking that interest directly themselves, in exchange for the valuable assets they were contributing to the deal,[6] the Trumblys agreed with Donaldson that he would take that interest in his name but hold it in trust for them.

Under the facts of this case, we cannot conclude that the arbitrator arbitrarily remade the operating agreement in reaching the conclusion that Donaldson held his interest in the company for the benefit of the Trumblys.  Given that *all* of the ownership interests in the company were being given out for consideration that had already been provided to the Trumblys (whether in the form of loans, services, or otherwise), the Kapurs could not have reasonably expected that Donaldson was going to provide $250,000 in legal services *after* the formation of the company and the acquisition of the station by the company.  Furthermore, as the arbitrator noted, the Kapurs' "42% interest would be the same whether Donaldson or the Trumblys held the interest."  While the operating agreement, on its face, certainly does imply that Donaldson was taking a 20 percent interest in the company for himself for services he had provided, nothing on the face of the agreement absolutely precluded Donaldson from taking that interest in his name but holding it for the benefit of the Trumblys, for whatever reason.  At the very

---

[6]    It is significant to note that, exclusive of the 20 percent interest Donaldson held in trust for the Trumblys and later conveyed to them, the operating agreement gave the Trumblys only 7 percent ownership interest in the company in exchange for their contribution of all of the television station's licenses and assets.

16

least, the Kapurs have not shown that the arbitrator acted *arbitrarily*, as required by *PG&E*, in determining that Donaldson held his interest in trust for the Trumblys. The arbitrator had a legitimate basis for his conclusion that was rooted in the evidence presented and that was not in direct contradiction to any express language of the agreement. Under these circumstances, we cannot conclude that the arbitrator exceeded his powers.

In a substantively different argument that lacks a separate heading, the Kapurs contend the arbitrator exceeded his powers in upholding the trust between Donaldson and the Trumblys because, according to the Kapurs, the trust was "contrary to public policy and the law because it validated and abetted the Trumblys' efforts to evade their creditors." In this argument, which, in addition to being buried under an unrelated heading, is not well developed (amounting to less than a single page), the Kapurs fail to adequately explain how the arrangement between Donaldson and the Trumblys violated the law or "a well-defined public policy." (*Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1195 ["An arbitrator exceeds his or her powers if the arbitration award violates a statutory right or otherwise violates a well-defined public policy"].) They cite the Uniform Fraudulent Transfer Act (Civ. Code, § 3439.04) for the proposition that it is illegal to make a transfer of assets "with actual intent to hinder, delay, or defraud any creditor" of the transferor, but they fail to identify any such transfer here in the trust arrangement between Donaldson and the Trumblys. Under these circumstances, we again conclude that the Kapurs have failed to show that the arbitrator exceeded his powers. Accordingly, we find no error in the trial court's ruling granting defendants' petition to confirm the arbitration award and denying the Kapurs' competing petition to vacate that award.

17

DISPOSITION

The judgment in case No. 70 is affirmed, and the appeal in case No. 33 is dismissed as taken from a nonappealable order.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


       ROBIE       , Acting P. J.


We concur:


     MAURO     , J.


     DUARTE     , J.