Filed 11/16/20  Wells Fargo Bank v. Warren CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WELLS FARGO BANK et al., | C080263 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34201500178429) |
| v. | |
| ALLEN W. WARREN, | |
| Defendant and Appellant. | |

California law allows a court to vacate an arbitration award if, as relevant here, the arbitrators "exceeded their powers."  (Code Civ. Proc., § 1286.2, subd. (a)(4).)[1]  But as courts have long explained, arbitrators do not exceed their powers merely by wrongly deciding a contested issue of fact or law.  Rather, a party seeking judicial review of an arbitration award on this ground must show the decision violates a party's nonwaivable

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

statutory rights, contravenes an explicit legislative expression of public policy, or is otherwise reviewable based on some other exceptional circumstance.

Allen Warren and four of his companies seek review of an arbitration decision that, in their view, misinterpreted the termination clause in their contract with Wells Fargo.[2] They contend this clause required Wells Fargo to calculate early termination fees one way, but the arbitrators wrongly allowed Wells Fargo to calculate these fees another way. Even assuming error, however, an error of this sort presents none of the limited circumstances that would warrant judicial review of an arbitration award. Because error alone is insufficient to allow judicial review, we affirm the trial court's judgment in favor of Wells Fargo.

BACKGROUND

I

Allen Warren is the owner of New Faze Holdings, LLC (New Faze), a real estate development company. In 2005, New Faze obtained two multimillion-dollar loans from Wells Fargo to finance the purchase of two apartment buildings in Sacramento County. Both loans were variable rate loans.

To hedge against the risks posed by rising interest rates on these loans, New Faze also entered into two interest rate swap agreements with Wells Fargo. An interest rate swap is an agreement between two parties to exchange one stream of interest payments for another, over a set period of time. The most common type, and the type at issue here, involves party A (here, Wells Fargo) paying party B (here, New Faze) the interest accruing on a hypothetical principal amount (the notional amount) based on a *floating* interest rate, while party B pays party A the interest accruing on the same notional

---

[2] Plaintiffs and respondents in this case are Wells Fargo Bank, National Association and Wells Fargo Advisors, LLC. We refer to these entities collectively as Wells Fargo.

amount based on a *fixed* interest rate. (See *Thrifty Oil Co. v. Bank of America Nat. Trust* (9th Cir. 2003) 322 F.3d 1039, 1042-1043.)

The parties' two interest rate swap agreements varied only in terms of the relevant notional amount—one agreement used the principal listed in one of the loans as the notional amount, and the other used the principal listed in the second loan as the notional amount. By pegging the notional amounts to the two loans, these swap agreements offered New Faze a hedge against the risk of rising interest rates on the variable rate loans. If interest rates rose, for example, New Faze would be obligated to make larger interest payments on its loans; but under the swap agreements, that increase would now be offset in part by Wells Fargo's similarly increasing interest payments to New Faze. The swap agreements were secured by the two apartment buildings that New Faze purchased using the loans, and each agreement was to last 10 years—December 1, 2005 to December 1, 2015.

Both swap agreements were subject to an Interest Rate Master Agreement (Master Agreement). The Master Agreement allowed either party to terminate the swap agreements if the other failed to make a payment when due or otherwise defaulted on its obligations. It also allowed Wells Fargo to unilaterally terminate the agreements if New Faze became insolvent, failed to make a payment when due, breached its obligations under the loan agreements, ended up not borrowing money, or, most relevant here, "repa[id] its obligations, and [Wells Fargo] ha[d] no further commitment to lend, under" the two loans.

In the event Wells Fargo terminated the swap agreements following New Faze's "repay[ment] [of] its obligations" or its declining to borrow money, New Faze would need to pay an early termination fee based on the mean amount that "three leading commercial banks or investment banking firms in San Francisco, Los Angeles or New York," selected in good faith by Wells Fargo, would charge to assume New Faze's

position under the swap agreements.[3]  In other words, New Faze would need to pay a termination fee relating to the amount that Wells Fargo would have to pay to enter into new transactions offering the same terms as the existing swap agreements.  In the event one of the parties terminated the Master Agreement based on any of the other grounds listed in the agreement, which all concerned the other's default, then the defaulting party would need to pay the early termination fee.

The Master Agreement, in addition to its own specific provisions, also incorporated all provisions from the two earlier loan agreements, including the loan agreements' arbitration provisions.  It thus obligated the parties "to submit to binding arbitration all claims, disputes and controversies" relating to the loans and related loan agreements.

In late 2007, New Faze sought to terminate its loan agreements with Wells Fargo, modify its swap agreements to release the collateral (the two apartment buildings) that secured the agreements, and enter into new loan agreements—presumably on better terms—with another bank.  Wells Fargo, however, agreed to do so only if the swap agreements were also terminated, rather than simply modified, and New Faze paid all obligations in connection with the early termination.  Wells Fargo later added that the early termination fees on the swap agreements would be around $700,000.  New Faze accepted Wells Fargo's terms, and in early 2008, New Faze repaid both its loans to Wells Fargo and also paid Wells Fargo's requested termination fees of $725,112—$385,112 for one of the swap agreements and $340,000 for the other.

---

[3]      If these "three leading commercial banks or investment banking firms" would charge nothing to assume New Faze's position, and instead would be willing to pay to assume this position, then Wells Fargo would have had to pay New Faze the mean amount that these institutions would have been willing to pay.

Sometime after paying these fees, New Faze learned that Wells Fargo had itself calculated the early termination fees, and did not, as New Faze believed was required under the Master Agreement, obtain quotes from "three leading commercial banks or investment banking firms" to determine the termination fees.

II

In September of 2013, New Faze, Allen Warren, 11070 Vintage, LLC, 1257 Alpine Terrace, LLC, and Warren Rancho, LLC (collectively, New Faze) filed a demand for arbitration with the American Arbitration Association, alleging, among other things, that Wells Fargo breached its contractual obligations under the Master Agreement when calculating the early termination fees.

Wells Fargo afterward filed a motion for summary judgment or, alternatively, summary adjudication, which a three-person arbitration panel granted in part. As relevant here, the panel found that Wells Fargo was not, as New Faze claimed, required to obtain three market quotes to calculate the early termination fees. Although New Faze maintained that Wells Fargo had terminated the Master Agreement following New Faze's "repay[ment] [of] its obligations"—which would have triggered the provision requiring Wells Fargo to obtain market quotes—the panel instead found the parties had terminated the Master Agreement on a ground other than one listed in the agreement, making the agreement's requirement that Wells Fargo obtain market quotes inapplicable. The panel further found no evidence showed the termination fees would have been materially different had Wells Fargo based the fees on market quotes. It thus held that New Faze's breach of contract claim failed as a matter of law. Shortly after, the panel heard New Faze's remaining claims and issued a decision in favor of Wells Fargo on all remaining counts.

Two weeks after the arbitrators issued their final decision, Wells Fargo filed a petition in Sacramento County Superior Court to confirm the arbitration award.

(See § 1285 [a "party to an arbitration in which an award has been made may petition the court to confirm, correct or vacate the award"].)

On July 1, 2015, the court granted Wells Fargo's petition, explaining that the panel's construction of the Master Agreement was "a plausible interpretation" that was not "so 'completely irrational' as to be 'arbitrary.' "  It acknowledged that the panel's decision may have been wrong, but found that "arbitrators do not exceed their powers simply by reaching an erroneous conclusion on a contested issue or fact or law."

New Faze timely appealed, contending the trial court should have found the arbitrators "exceeded their powers" within the meaning of section 1286.2, subdivision (a)(4).

## DISCUSSION

### I

California law favors arbitral finality and, for that reason, strictly limits judicial review over arbitration awards.  (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)  As the California Supreme Court has explained, "the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels." (*Id.* at p. 10.)  In light of this intent, judicial review of arbitration decisions is narrow.  (*Ibid.*)  And it is particularly narrow given that arbitrators may decide matters on different criteria than judges.  "Arbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action." (*Sapp v. Barenfeld* (1949) 34 Cal.2d 515, 523.)  "Thus, both because it vindicates the intentions of the parties that the award be final, and because an arbitrator is not ordinarily constrained to decide according to the rule of law, it is the general rule that, '[t]he merits of the controversy between the parties are not subject to judicial review.' [Citations.]" (*Moncharsh*, at p. 11.)  And that

generally remains true even when the arbitrator's decision includes clear errors of fact or law.  (*Ibid.*; see also *id.* at p. 25.)

The California Arbitration Act (§ 1280 et seq.), however, provides limited grounds for judicial review of arbitration awards.  Relevant here, section 1286.2, subdivision (a)(4) authorizes courts to vacate an arbitration award if the "arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted."  Relatedly, if the arbitrators exceeded their powers and the award *can* be corrected without affecting the merits, a court may correct the arbitration award without vacating it.  (§ 1286.6, subd. (b).)

This exception allowing judicial review when arbitrators exceed their powers is a narrow one.  (*Moshonov v. Walsh* (2000) 22 Cal.4th 771, 773 (*Moshonov*).)  As the California Supreme Court has stated, arbitrators generally do not exceed their powers merely by issuing an award that includes "errors of fact or law, even when those errors appear on the face of the award or cause substantial injustice to the parties."  (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916.)  Rather, under the court's precedent to date, arbitrators "exceed their powers" when rendering a decision that (1) "violates a party's unwaivable statutory rights" (*ibid.*); (2) "contravenes an explicit legislative expression of public policy"—for example, when arbitrators enforce an illegal contract (*ibid.*; *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 610); (3) violates an "explicit[] and unambiguous[]" limitation that the parties had imposed on the arbitrators' authority (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1185); (4) includes a remedy bearing no "rational relationship" to the arbitrators' own interpretation of the underlying contract (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 367 (*Advanced Micro Devices*)); or (5) exceeds "the scope of the controversy submitted to the arbitrators" (*Moshonov*, at p. 775).

The Supreme Court has left open the possibility that other limited circumstances may also warrant a finding that the arbitrators "exceeded their powers."  On that score,

we note two other circumstances that other courts have found to justify review. Some federal courts, for example, have found review warranted when an arbitrator's decision is based on a "manifest disregard" of the law. (See, e.g., *Collins v. D.R. Horton, Inc.* (9th Cir. 2007) 505 F.3d 874, 879-880 [describing the "manifest disregard" standard of review and explaining that it applies when an arbitrator recognized applicable law but then ignored it].) The California Supreme Court has acknowledged this "manifest disregard" standard of review, but it has so far declined to rule on its applicability under California law. (*Richey v. AutoNation, Inc.*, *supra*, 60 Cal.4th at p. 918, fn. 1.) Several California courts, in addition and most relevant here, have found judicial review warranted when the arbitrator's construction of the parties' contract "presents such an egregious mistake that it amounts to an arbitrary remaking of the contract between the parties." (*Pacific Gas & Electric Co. v. Superior Court* (1993) 15 Cal.App.4th 576, 592-593 (*Pacific Gas & Electric*).) Our Supreme Court, however, has questioned the continued validity of this principle, though it has yet to decide the matter conclusively. (*Advanced Micro Devices*, *supra*, 9 Cal.4th at pp. 376-377 & fn. 10.)[4]

II

A

Although acknowledging the limited review of arbitration awards, New Faze contends the arbitrators' decision here should be vacated because it effectively rewrote the Master Agreement. Because we find the arbitrators' award is not subject to judicial review, however, we reject New Faze's claim.

As New Faze alleges, the Master Agreement contemplated two general grounds for early termination, as described in paragraph 3 of the agreement: (1) either party could

---

[4] For a summary of the circumstances under which lower courts have found arbitrators exceeded their powers, see *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443.

terminate the agreement if the other failed to perform its obligations under the contract, and (2) Wells Fargo could terminate the agreement if, as relevant here, New Faze repaid the amounts owed under the loans. Under either ground for termination, the early termination fees were to be based on the mean amount that "three leading" banks or investment banking firms, selected by Wells Fargo, would charge to assume New Faze's position under the swap agreements. New Faze maintains this provision was triggered when Wells Fargo terminated the Master Agreement following New Faze's repayment of the amounts it owed under the loans. And it contends the arbitrators effectively wrote this requirement out of the agreement by finding that Wells Fargo, despite its failure to obtain these quotes, did not breach the agreement.

In support of its argument that this alleged error is reviewable, New Faze relies principally on *Pacific Gas & Electric*, which, as discussed above in part I of the Discussion, provides that an arbitrator's construction of the parties' contract may be vacated when it "presents such an egregious mistake that it amounts to an arbitrary remaking of the contract between the parties." (*Pacific Gas & Electric*, *supra*, 15 Cal.App.4th at pp. 592-593.)

Again, however, the California Supreme Court questioned the continued validity of this " 'arbitrariness' " standard in *Advanced Micro Devices*, *supra*, 9 Cal.4th 362. (See *id.* at pp. 376-377 & fn. 10.) The court's decisions since *Advanced Micro Devices*, moreover, have cast further doubt on the applicability of this and similar standards that allow courts to evaluate the merits of an arbitrator's decision simply because the challenging party believes it wrong.

The court's decision in *Moshonov* is a notable example. The parties there had entered into a contract for the sale of a residential property, and as part of the contract, agreed that " '[s]hould arbitration or suit be brought to enforce the terms of this contract,' " the prevailing party would be entitled to attorney fees. (*Moshonov*, *supra*, 22 Cal.4th at p. 774.) In a later arbitration between the parties, following the buyer's

assertion of various claims against the sellers relating to the sale, an arbitrator found for the sellers but declined to award them attorney fees. (*Id.* at pp. 774-775.) The arbitrator reasoned that the buyer's allegations (e.g., that the sellers had negligently advised her about the property's condition) were noncontractual in nature and so were beyond the scope of the attorney fees provision. (*Id.* at p. 775.) The defendants afterward petitioned the trial court to correct the award, contending the arbitrator exceeded her powers by misinterpreting the parties' contract. (*Ibid.*) But the trial court denied the petition and the California Supreme Court later affirmed, finding the arbitrator's decision unreviewable on the merits. (*Id.* at pp. 775-776.) The court "explained that arbitrators do not 'exceed[] their powers' within the meaning of section 1286.2, subdivision (d)[5] and section 1286.6, subdivision (b) merely by rendering an erroneous decision on a legal or factual issue, so long as the issue was within the scope of the controversy submitted to the arbitrators." (*Id.* at p. 775.) It then found that because the parties there submitted their dispute over attorney fees to binding arbitration, the resulting "arbitrator's decision was final and could not be judicially reviewed for error." (*Id.* at p. 776.)

In a related companion case, *Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782 (*Moore*), the court summed up a similar dispute this way: "Having submitted the fees issue to arbitration, plaintiffs cannot maintain the arbitrators exceeded their powers, within the meaning of section 1286.6, subdivision (b), by deciding it, even if they decided it incorrectly." (*Id.* at p. 787.)

Applying the reasoning of *Moshonov* and *Moore*, we find the arbitrators' decision here unreviewable. New Faze demanded arbitration to resolve the parties' dispute over the termination fee, and the arbitrators' resulting decision concerning this fee was thus plainly within the scope of the issues submitted for arbitration. New Faze does not allege

---

5       Now section 1286.2, subdivision (a)(4).

otherwise. On *Moshonov*'s logic, that should be the end of the matter: because the arbitrators' interpretation of the Master Agreement was within the scope of the issues submitted for arbitration, it "was final and could not be judicially reviewed for error." (*Moshonov, supra*, 22 Cal.4th at p. 776.) Or to use the court's language in *Moore*, "[h]aving submitted the [termination] fees issue to arbitration, [New Faze] cannot maintain the arbitrators exceeded their powers . . . by deciding it, even if they decided it incorrectly." (*Moore, supra*, 22 Cal.4th at p. 787; see also *Moshonov*, at p. 779 ["Interpretation of the contract underlying this dispute being within the matter submitted to arbitration, such an interpretation could amount, at most, to an error of law on a submitted issue, which we have held is not in excess of the arbitrator's powers within the meaning of sections 1286.2 and 1286.6."]; *Safari Associates v. Superior Court* (2014) 231 Cal.App.4th 1400, 1413 [an arbitrator's legally incorrect decision, even if " 'explicitly contradict[ed]' [by] the parties' agreement, is just that—a legally incorrect decision, which is not subject to correction"].)

Although New Faze contends a more searching review is warranted when the arbitrators' decision concerns a particularly egregious interpretation of the underlying contract, that position cannot be reconciled with the reasoning of *Moore* and *Moshonov*. Perhaps the court in those two cases would have found the arbitrators' decisions egregiously wrong had it considered the merits of the parties' claims. But the court declined to engage in such a review and instead rested on its finding that the decisions were simply unreviewable. That same reasoning defeats New Faze's claim here.

B

Even if *Pacific Gas & Electric*'s "arbitrariness" standard of review remains good law, moreover, New Faze's argument would still fail, as it has not shown the arbitrators' award to be so arbitrary as to effectively rewrite the Master Agreement.

Unlike the court's decision in *Moshonov*—which declined to consider the merits of the challenging party's claims altogether—*Pacific Gas & Electric*'s "arbitrariness"

standard of review allows some consideration of the merits, albeit under a highly deferential standard. In *Pacific Gas & Electric*, the court explained that the "narrow exception" it recognized for reviewing arbitration decisions was "so strict that it should discourage all but the most serious claims of abuse." (*Pacific Gas & Electric*, *supra*, 15 Cal.App.4th at p. 594.) Even a "conviction that another construction of the contract is plainly correct," the court noted, would not warrant review. (*Ibid.*) Applying this "strict" standard, the court found that the party seeking review there had not shown review to be justified. (*Ibid.*) And this was so even though the party's interpretation of applicable law was "a strong one, perhaps even compelling." (*Id.* at p. 602.) Because the party's offered interpretation was "not the only meaning that c[ould] be assigned without arbitrarily remaking the contract of the parties," the court held, the party's argument fell short. (*Ibid.*)

Similar logic defeats New Faze's claims here. New Faze's argument that the Master Agreement required Wells Fargo to obtain three market quotes to calculate the termination fees is perhaps the stronger one, but the arbitrators' contrary conclusion was not so implausible as to "arbitrarily remak[e] the contract of the parties." (*Pacific Gas & Electric*, *supra*, 15 Cal.App.4th at p. 602.)

The arbitrators acknowledged that paragraph 3 of the Master Agreement described the grounds for early termination, but ultimately found that Wells Fargo and New Faze terminated the agreement on some other basis. Although New Faze objects that the parties could not have terminated the agreement on a ground other than one stated in the agreement, the arbitrators' contrary finding was not an implausible one. The record shows the parties negotiated the termination of the Master Agreement, and the arbitrators could have found this negotiation resulted in the parties agreeing to an alternative ground for termination. (See *Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 519 ["It is axiomatic that the parties to an agreement may modify it."].) Wells Fargo told New Faze that it would not terminate the loan agreements and modify the swap agreements, as New Faze

desired, unless New Faze paid an early termination fee of $725,112 on the swap agreements; and New Faze ultimately paid the requested amount to move forward with its desired refinancing of the loans. A finding that the parties thereby agreed to terminate the Master Agreement on a ground other than one contemplated under the agreement might be misguided, but we could not say such a finding "presents such an egregious mistake that it amounts to an arbitrary remaking of the contract between the parties." (*Pacific Gas & Electric*, *supra*, 15 Cal.App.4th at pp. 592-593; see also *Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at p. 9 ["courts will ' "indulge every intendment to give effect to such proceedings" ' "].)

Again, we acknowledge that New Faze's reading of the Master Agreement is a reasonable one, and were we reviewing this claim on a blank slate, we would perhaps agree with its interpretation. But we are not reviewing this matter on a blank slate, and we cannot vacate the arbitration award simply because we might have ruled otherwise. (*Morris v. Zuckerman* (1968) 69 Cal.2d 686, 691 [a court "may not substitute its judgment for that of the arbitrators"].)**6**

---

**6**    Although parties to arbitration may agree that an award may be reviewed for legal error (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1355), the parties' agreements here included no such terms.

## DISPOSITION

The judgment is affirmed.  Wells Fargo is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


    /s/
    BLEASE, Acting P. J.



We concur:



    /s/
HULL, J.



    /s/
MAURO, J.